ASSOCIATED METALS AND MINER-
ALS CORPORATION, Appellant,

v.

Gerald P. CARMEN (individually, as Ad-
ministrator of the General Services Ad-
min., acting in his official capacity), et
al.

No. 81–2263.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 3, 1982.

Decided March 22, 1983.

As Amended April 25, 1983.

Stephen N. Shulman, Washington, D.C.,
with whom Mark C. Ellenberg and Jerome
A. Madden, Washington, D.C., were on the
brief, for appellant. Frederick P. Waite,
Washington, D.C., also entered an appear-
ance for appellant.

John D. Bates, Asst. U.S. Atty., Wash-
ington, D.C., with whom Stanley S. Harris,
U.S. Atty., Royce C. Lamberth and R. Craig
Lawrence, Asst. U.S. Attys., Washington,
D.C., were on the brief, for appellees. Ken-
neth M. Raisler, Asst. U.S. Atty., Wash-
ington, D.C., also entered an appearance for
appellees.

Before ROBINSON, Chief Judge, Mac-KINNON and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge MacKINNON.

Concurring opinion filed by Chief Judge SPOTTSWOOD W. ROBINSON, III.

MacKINNON, Circuit Judge.

Appellant, Associated Metals & Minerals Corp. (Metals), challenges the method by which the General Services Administration (GSA) is disposing of 30,000 tons of surplus tin from the National Defense Stockpile. Congress authorized the disposal of the surplus tin and directed that its disposal "be carried out in accordance with the provisions of the Strategic and Critical Materials Stock Piling Act (50 U.S.C. 98 et seq.)." Strategic and Critical Materials Transaction Authorization Act of 1979, Pub.L. No. 96–175, §§ 3, 4, 93 Stat. 1289 (Strategic Materials Act). The Strategic and Critical Materials Stock Piling Act of 1979, Pub.L. No. 96–41, 93 Stat. 319 (Stock Piling Act) provides, *inter alia:*

To the maximum extent feasible—

(1) competitive procedures shall be used in the acquisition and disposal of [strategic and critical] materials;

(2) *efforts shall be made in the acquisition and disposal of such materials to avoid undue disruption of the usual markets of producers, processors, and consumers of such materials and to protect the United States against avoidable loss;* and

(3) disposal of such material shall be made for domestic consumption.

50 U.S.C. § 98e(b) (Supp. IV 1980) (emphasis added).

Metals, operator of the sole tin smelter in the United States, brought this action for declaratory and injunctive relief in the United States District Court for the District of Columbia, alleging that GSA was disposing of the surplus tin in a manner which unduly disrupted the usual markets of the smelter in violation of section 98e(b) of the Stock Piling Act. Metals alleged that the GSA disposal practices placed its continued smelter operations in serious jeopardy. On July 22, 1981, the district court denied Metals' request for a preliminary injunction, and on October 21, 1981, on cross-motions for summary judgment, granted summary judgment for GSA. The district court concluded that

[u]ndisputed facts considered in the light of the relevant statutes and their legislative history demonstrate that [GSA's] practice of making off-the-shelf sales . . . was contemplated or ratified by Congress and that [GSA has] made the "efforts" required of them by Congress "to avoid undue disruption of the usual markets of producers, processors, and consumers," and that the markets have not, in fact, been unduly disrupted.

*Associated Metals & Minerals Corp. v. Carmen,* No. 81–1333, slip op. at 1 (D.D.C. Oct. 21, 1981) (footnote omitted).

Congress, when it authorized the disposal of the surplus tin, contemplated that GSA would use the very disposal method of which Metals complains. Furthermore, the record clearly demonstrates that GSA has made considerable efforts to avoid disrupting the tin market while it carries out the congressional directive to dispose of the surplus tin. The district court correctly perceived that Metals' true grievance was with Congress which authorized the disposal of the tin:

The undisputed facts show that if GSA carries out its mandate to sell 30;000 tons [of tin], there will be some market disruption, and [Metals] will make smaller profits . . . than it would if GSA were not a seller in the market. But this risk to market tranquility and to the Texas City smelter is attributable to free market forces and the Act of Congress, not to the whim of GSA.

*Id.* at 3. We affirm the judgment of the district court.

## I. BACKGROUND

### A. *United States Tin Market*

The United States consumes 40,000 to 60,000 tons of refined tin per year—approx-

imately 27 percent of the free world consumption—or about 150 to 225 tons of refined tin per working day. Three Southeast Asian nations—Malaysia, Thailand, and Indonesia—produce about 65 percent of the world's tin, with the majority of the balance produced in South America, principally Bolivia. The majority of refined tin produced in the Southeast Asian nations is sold in connection with the so-called Penang (Malaysia) Market. An official Penang Market price is established daily by a committee matching various purchase bids to available tonnage. The Penang Market price is the basis upon which most of the world's tin is sold. Brief for Appellant at 3–4.

The United States market for tin is centered in New York. There tin traders, who import refined tin to the United States for resale, arrange sales with consumers of tin. Each trader prices tin independently, and prices and volumes of actual transactions are not published. There are, however, several "New York prices" published regularly which purport to represent actual transactions. The price for refined tin in New York generally reflects its "replacement cost"—the cost of purchasing refined tin at its source and importing it to New York.[1] In other words, the New York price for refined tin is traditionally higher than the Penang Market price. *Id.* at 4–5.

Metals operates the only tin smelter in the United States, producing approximately 4,000 to 6,000 tons of refined tin per year—about 10 percent of the annual United States consumption. The smelter produces refined tin from tin bearing ores which it purchases abroad and and transports to the United States. The price of such ore is determined by calculating the value of its tin content as refined tin, usually based on the Penang Market price, and subtracting a negotiated amount which reflects the costs of the smelting process. *Id.* at 7–8. Since the price of the ore reflects the value of its refined tin content on the Penang Market, any profit earned by Metals' smelter derives from the negotiated deduction for smelting costs and the differential between the New York and Penang Market price for refined tin. *Id.* at 9.[2]

### B. *GSA Tin Disposal Program*

In 1979, Congress authorized GSA[3] to dispose of 35,000 tons of surplus tin from the National Defense Stockpile. Strategic and Critical Materials Transaction Authorization Act of 1979, *supra,* § 3. Of this amount, 5,000 tons were to be contributed to the International Tin Council,[4] *id.* § 5,

---

**1.** The cost of importing tin to the United States is primarily a function of the cost to transport the tin to the United States and, as payment for the tin is generally required prior to shipment, the cost of financing the purchase during shipment. Brief for Appellant at 5 n. 1.

**2.** Metals asserts that it competes for ore with smelters in other nations which have lower operating costs and, so, it cannot negotiate deductions which reflect its actual operating costs. For this reason, Metals claims that the New York-Penang Market price differential is critical to its profitability. Yet if that differential reflects the cost of transporting *refined tin* to the United States, *see* note 1 *supra,* then it would appear that the differential cannot fully compensate Metals for its cost of transporting *tin bearing ore* to the United States, much less offset its smelter's higher operating costs. Metals must incur greater transportation expenses importing tin bearing ore than importing refined tin because, by definition, a significant percentage of such ore is gangue.

Nevertheless, the reduction in the New York-Penang Market price differential which Metals alleges has been caused by GSA's tin disposal practices is clearly detrimental to the financial performance of Metals' smelter, irrespective of its dubious profit potential. Accordingly, Metals has standing to complain of GSA's tin disposal procedures.

**3.** The Strategic Materials Act authorizes the President to dispose of the surplus tin. Strategic and Critical Materials Transaction Authorization Act of 1979, *supra,* § 3. The President has delegated his authority to GSA. Exec.Order No. 12,155, 44 Fed.Reg. 53,071 (1979).

**4.** The International Tin Council was created by producers and consumers of tin as a means to stabilize tin prices. Pursuant to the International Tin Agreement the Council manages a "tin buffer stock" which is used to confine swings in the price of tin to predetermined ranges. When the price of tin is in the "no action" range, the Council may neither buy nor sell tin. If tin prices fall below this range—to

and 30,000 tons were to be sold according to the provisions of the Stock Piling Act. *Id.* § 4. Pursuant to this directive, GSA, beginning on July 1, 1980, offered 500 tons of surplus tin for sale every second week on a sealed bid basis. However GSA quickly found this procedure unacceptable. It rejected virtually all bids because, based on its comprehensive analysis of the New York tin market, the bids were too low and acceptance of such bids would have placed GSA in the undesired role of leading the tin market to substantially lower price levels. Affidavit of Readus B. Long, Director of the Stockpile Disposal Division, GSA ¶ 2 (Sept. 8, 1981) [hereinafter cited as Third Long Affidavit].

Accordingly, on October 22, 1980, GSA announced its intention to sell surplus tin on a daily, "off-the-shelf" basis, the same method it had successfully used in surplus tin sales from July, 1963, until June, 1978. *Id.* ¶ 5. Under the off-the-shelf method, GSA announces daily at 1:00 PM the price at which it is willing to sell surplus tin; orders are accepted at that price from 1:00 PM until 3:30 PM. Off-the-shelf sales of tin from December 1, 1980, until July 24, 1981, totaled 1,170 tons of refined tin, a rate of approximately 1,800 tons per year. Brief for Appellee at 10–12.

GSA undertakes an elaborate analysis of tin prices in the New York market each day before setting its acceptance price. It converts the reported Penang Market and London prices for refined tin to New York prices by adding estimates for the freight, insurance, interest, and handling expenses necessary to import tin to the United States. These calculated New York prices, as well as published "New York prices" and information obtained from a telephone survey of traders, producers, and consumers, are used to establish the GSA price. Affidavit of Readus B. Long, Director of the Stockpile Disposal Division, GSA ¶¶ 12, 15 (July 2, 1981) [hereinafter cited as First Long Affidavit]; Third Long Affidavit ¶ 4 (discussion of calculation of GSA acceptance price for December 3, 1980). GSA strives to minimize the impact of its tin disposal activities on the New York tin market by, *inter alia,* seeking to avoid price leadership in that market. First Long Affidavit ¶ 16; Affidavit of Readus B. Long, Director of the Stockpile Disposal Division, GSA ¶ 3 (July 10, 1981) [hereinafter cited as Second Long Affidavit]; Third Long Affidavit ¶¶ 3, 7.

## II. DISCUSSION

Metals argues that the off-the-shelf method of selling surplus tin adopted by GSA has unduly disrupted the tin market in violation of the Stock Piling Act, 50 U.S.C. § 98e(b)(2) (Supp. IV 1980).[5] In particular,

---

either the "may buy" or "must buy" range—the Council purchases tin to adjust the market price upward. Conversely, if tin prices rise above the "no action" range—to either the "may sell" or "must sell" range—the Council sells tin to adjust the market price downward. Brief for Appellant at 10. The 5,000 tons of surplus tin contributed to the Council by the United States was intended to assist the Council in these market management activities. Strategic and Critical Materials Transaction Authorization Act of 1979, *supra,* § 5. See 125 Cong.Rec. S14,653–54 (daily ed. Oct. 16, 1979) (statements of Sen. Javits and Sen. Church).

**5.** Metals makes an additional argument which we briefly address. It asserts that since the Strategic Materials Act authorized both the sale of 30,000 tons of surplus tin and the contribution of 5,000 tons of surplus tin to the International Tin Council, Strategic and Critical Materials Transaction Authorization Act of 1979, *supra,* §§ 3, 5, that the "GSA disposal authori-

ty was supposed to complement" the contribution to the tin buffer stock. *See* note 4 *supra.* Accordingly, Metals argues that GSA may not sell surplus tin unless the price of tin is in either the "may sell" or "must sell" ranges established pursuant to the International Tin Agreement.

However, section 4 of the Strategic Materials Act specifically provides that sale of the surplus tin is to be governed by the Stock Piling Act and nothing in the Stock Piling Act supports the limitation on GSA sales urged by Metals. The Stock Piling Act was adopted by Congress to address, *inter alia,* its concern that prior sales from the National Defense Stockpile had been motivated by reasons other than national defense. Thus Representative Bennett, sponsor of the Stock Piling Act in the House, in discussing predecessor legislation, stated:

As the Members of this House know, past administrations have misused the stockpiles in budgetary situations. When things looked

Metals claims that the off-the-shelf sales have reduced the New York-Penang Market price differential, the existence of which it argues is critical to the survival of its smelting operation.[6] Metals also asserts that since revenues from sales of surplus tin are not necessary to pay for currently authorized acquisitions for the National Defense Stockpile, any market disruption attributable to GSA sales of surplus tin is "undue." Metals' contentions are without merit.

■ At the outset we note that our review of this case is governed by the Administrative Procedure Act. We must determine whether GSA's decision to dispose of surplus tin by the off-the-shelf method of sale was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976). This inquiry requires the Court to consider whether the decision made by GSA was within the scope of the authority granted by the Stock Piling Act and the Strategic Materials Act, as well as whether that decision "was based on a consideration of the relevant factors and whether there has has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Our review is a narrow one

which begins with the presumption that GSA's decision is valid. *Certified Color Manufacturers Ass'n v. Mathews,* 177 U.S. App.D.C. 137, 146, 543 F.2d 284, 293 (1976). We may not substitute our judgment for that of GSA if a rational basis exists for its decision. *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 823.

■ The Strategic Materials Act directs GSA to dispose of 30,000 tons of surplus tin in accordance with the provisions of the Stock Piling Act. The Stock Piling Act enjoins GSA *"to dispose of materials in the stockpile"* when directed to do so by Congress. 50 U.S.C. § 98e(a)(6) (Supp. IV 1980) (emphasis added). "To the maximum extent feasible," consistent with its obligation to dispose of the surplus tin, GSA is obligated to make *"efforts . . . to avoid undue* disruption of the usual markets of producers, processors, and consumers of [tin] and to protect the United States against avoidable loss." *Id.* § 98e(b)(2) (Supp. IV 1980) (emphasis added). The overriding purpose of Congress in enacting the Strategic Materials Act was to *dispose of surplus tin* in order to obtain funds to acquire necessary strategic materials.[7] The

---

bad in the budget, there was a tendency to rush in and ask Congress to dispose of some materials in the stockpile, apparently to make the budget look good and not for any legitimate defense stockpiling purpose.

124 Cong.Rec. 31,261 (1978) (statement of Rep. Bennett). Thus the Stock Piling Act explicitly provides that "the stockpile is to serve the interest of national defense only and *is not to be used for economic or budgetary purposes."* 50 U.S.C. § 98b(b)(1) (Supp. IV 1980) (emphasis added). The Senate report accompanying the Stock Piling Act is even more explicit: [T]hese stockpiles are for the purpose of the common defense of the United States. *They are not to be used as a means of controlling or influencing commodity prices* and they are not to be sold off indiscriminately to produce receipts that offset other defense costs.

S.Rep. 96–201, 96th Cong., 1st Sess. 3 (1979), U.S.Code Cong. & Admin.News 1979, pp. 793, 795 (emphasis added). For this Court to limit GSA's disposal of surplus tin as urged by Metals it would have to attribute to Congress the intent to use the National Defense Stockpile to control commodity prices, in direct contradiction to the clear statement of congressional

intent found in the language of the Stock Piling Act. That this Court cannot do.

**6.** Metals supports its claim that the New York-Penang Market price differential has been reduced by GSA's off-the-shelf tin sales with a report by an economic consultant, Dr. Samuel Rosenblatt. GSA vigorously disputes the validity of Dr. Rosenblatt's report. It is not necessary to resolve this dispute because even if Metals has satisfactorily demonstrated that the price differential has been reduced by GSA's tin sales, that impact on the New York tin market is insufficient to render GSA's use of off-the-shelf sales unlawful. *See* discussion *infra.*

**7.** Senator Hart, sponsor of the Strategic Materials Act in the Senate, stated: [E]arlier this year the Senate acted on a stockpile policy bill [the Stock Piling Act] which set out policy and management guidelines for reshaping our national defense stockpile. . . . *It is now time to get on with specific transactions*—the buying of needed materials and the selling of excess materials—*to get the right materials, in the right*

"undue disruption" provision of the Stock Piling Act, 50 U.S.C. § 98e(b)(2), must be read to effectuate this overriding congressional purpose.

■ The record in this case clearly demonstrates that GSA has made considerable efforts to avoid disrupting the New York tin market with its surplus tin disposal program. It conducts an elaborate analysis of that market on a daily basis before establishing its price for tin. It strives to set its prices so as to avoid market leadership. First Long Affidavit ¶¶ 12, 15, 16; Second Long Affidavit ¶ 3; Third Long Affidavit ¶¶ 3, 4, 7.

Although Metals disputes GSA's contention that it has avoided market leadership, that position cannot be sustained. For if GSA were leading the market with its prices, tin consumers would rush to satisfy their tin requirements with purchases from GSA. In fact, evidence in the record demonstrates that GSA's tin sales have been slow, rarely approaching the level of daily tin consumption in the United States.[8] Second Long Affidavit ¶ 3. The fact that GSA has been selling tin at a rate of only 1,800 tons per year, rather than at the rate of 10,000 tons per year which GSA predicted for a strong tin market, S.Rep. No. 96–338, 96th Cong., 1st Sess. 6 (1979), indicates that GSA is cognizant of the current weakness in the tin market and has adjusted its tin disposal program to reduce impacts on the tin market.

Furthermore, Congress explicitly ratified GSA's use of the off-the-shelf method for its tin disposal program. The House report on the Strategic Materials Act stated that the surplus tin would "be sold by formal advertising or *off the shelf—GSA fixed price daily.*" H.R.Rep. No. 96–56, 96th Cong., 1st Sess. 3 (1979) (emphasis added). Although Congress clearly was concerned that the market not be disrupted by the disposal of the surplus tin, it repeatedly commended GSA for its success in avoiding such disruption in its past stockpile disposal transactions. Thus, in discussing the "undue disruption" provision of the Stock Piling Act, the Senate report noted that the

committee has no prejudice against the use of [GSA] to manage the stockpiles; *to the contrary, industry and other Federal agencies have applauded the GSA stockpile management in the past* . . . . [T]he committee has required that . . . disposal not unduly disrupt the usual commodity market. *The committee recognizes that every stockpile transaction affects the commodity market to some degree; however . . . GSA has been extremely successful in the past at minimizing market impacts and the committee expects that record of performance to continue.*

S.Rep. No. 96–201, 96th Cong., 1st Sess. 5 (1979), U.S.Code Cong. & Admin.News 1979, p. 797 (emphasis added).[9] Among past disposal transactions successfully carried out by GSA was the disposal of 133,570 tons of surplus tin by the off-the-shelf method from July 23, 1963, until June 27, 1978. Third Long Affidavit ¶ 5. Clearly Congress, in directing GSA to sell 30,000 tons of surplus tin, anticipated that GSA would uti-

---

*quantity, in the right place, so that our strategic stockpiles can serve their intended purpose.*
125 Cong.Rec. S14,652 (daily ed. Oct. 16, 1979) (statement of Sen. Hart) (emphasis added).

**8.** Daily tin sales under GSA's off-the-shelf program exceeded 50 percent of the average working-day consumption of tin in the United States on only 5 of 135 days on which tin was offered for sale through July 24, 1981; tin sales in any amount occurred on only 35 of those days. Joint Appendix at 121–22; Third Long Affidavit ¶ 9. Tin sales have been made at the rate of 1,800 tons per year, a mere 3 percent of the annual tin consumption in the United States.

**9.** *Accord* H.R.Rep. No. 96–46, 96th Cong., 1st Sess. 5–6 (1979). Representative Bennett, sponsor of the Strategic Materials Act, when explaining its provisions on the floor of the House, stated that

*GSA has disposed of over 30 commodities in the last 14 years, generating revenues in excess of $7 billion without any undue market disruption.* At least, there have been no instances of market disruption brought to my attention since I have been chairman of the Seapower and Strategic and Critical Materials Subcommittee.
125 Cong.Rec. 7058 (1979) (statement of Rep. Bennett) (emphasis added).

lize the off-the-shelf method which it had successfully used to dispose of surplus tin in the past.[10]

Finally, the legislative history of the Stock Piling Act indicates that the reduction in the New York-Penang Market price differential complained of by Metals is not the type of impact on the tin market which concerned Congress when it adopted the "undue disruption" provision. That provision had its origin in the original Strategic and Critical Materials Stock Piling Act, Pub.L. No. 79–520, 60 Stat. 596 (1946), which provided that plans for disposal of surplus stockpile materials were to be

> fixed *with due regard to* the protection of the United States against avoidable loss on the sale or transfer of the material to be released and *the protection of producers, processors, and consumers against avoidable disruption of their usual markets* . . . .

Id. § 3(e), 50 U.S.C. § 98b(e) (1976) (codified as amended at 50 U.S.C. § 98e(b)(2) (Supp. IV 1980)) (emphasis added). Congress thought the "undue disruption" provision would prevent recurrence of the indiscriminate *dumping* of surplus strategic materials which disrupted the commodities markets after World War I.[11] The Senate report indicated that the provision was "designed to protect producers and traders against *sudden disposals of strategic materials* no longer needed *in such quantities as might break the market.*" S.Rep. No. 79–804, 79th Cong., 1st Sess. 5–6 (1945), *reprinted in* 1946 U.S.Code Cong. Serv. 1288, 1292 (emphasis added). Although the operative language of the "undue disruption" provision was changed slightly in 1979, nothing in the legislative history of the Stock Piling Act indicates that Congress was concerned with anything but significant disruptions in commodity markets caused by dumping of surplus materials.[12]

**10.** Metals offered no evidence that GSA's off-the-shelf procedures have changed from those which it successfully used to dispose of tin in the past. Nor has Metals suggested any reason why those procedures might have greater impacts on the New York tin market today than they had in the past.

**11.** *See, e.g., Stock-Piling: Hearings on S.752 Before the Subcomm. on Surplus Property of the Senate Comm. on Military Affairs,* 79th Cong., 1st Sess. 26 (1946) (statement of E.W. Pehrson, Chief of Economics & Statistics Branch, Bureau of Mines, Department of the Interior):

> Another important factor, however, is the need for preventing the dumping of postwar surpluses on markets. Many of us lived through the conditions that resulted from the dumping of war surpluses after World War I, and . . . we feel that it is extremely important to see to it that [the "undue disruption"] provision is continued, which, of course, the present stockpiling bill does.

**12.** An exchange between Senator Hart and Representative Bennett indicates that the change in the language of the "undue disruption" provision of the Stock Piling Act was not intended to change the effect of the original provision:

> Senator HART: Do you think that any future law that we adopt . . . should contain restrictions against so-called unduly disrupting the marketplace, or anything like that?
>
> Mr. BENNETT: I think the law, as it now exists, is adequate. You have to bear in

mind that any disposals you make . . . can have a specific thing in it that slows up the disposal or gives special cautions. But the basic law already requires that caution be taken. . . . [T]hey are already directed by law to do that.

> Senator HART: *Do you feel that that law is adequate as it has been administered?*
>
> Mr. BENNETT: *I do. I would not suggest changing it.*

*General Stockpile Policy: Hearing on S.1198 Before the Subcomm. on Military Construction and Stockpiles of the Senate Comm. on Armed Services,* 95th Cong., 1st Sess. 13 (1977) (emphasis added). To a like effect is the following colloquy between Senator Hart and Simon Strauss, representing the American Mining Congress, a mining industry trade association:

> Senator HART: Do you think the so-called "undue disruption" provision in disposal law is adequate?
>
> Mr. STRAUSS: Yes. I don't know how you can improve on that. I think that is the guideline and it is up to the officials in charge to pay attention to it. They will have pressures, of course, both from producers who are sellers and from consumers who are buyers—from opposite directions—and that tends to keep them honest.

*Id.* at 67. *See also* 125 Cong.Rec. S14,654 (daily ed. Oct. 16, 1979) (statement of Sen. Church).

The Court is cognizant of statements in the legislative history of the Strategic Materials Act expressing concern regarding the impact of the tin disposal program on the Texas City

Clearly, the reduction in the New York-Penang Market price differential is not the type of *break* in the market which concerned Congress and led it to enact the "undue disruption" provision. Rather, the change in the price differential is the type of market change which Congress realized would occur any time GSA entered a market to dispose of surplus strategic materials.[13] Indeed, Metals' argument attributing the reduction in the price differential to GSA's off-the-shelf sales of tin is premised on the mere presence of GSA as a potential seller of tin.[14] Thus Metals' real grievance lies with Congress for having directed GSA to dispose of the surplus tin, rather than with GSA for having adopted the off-the-shelf method of sales to comply with that congressional directive. *See Associated Metals & Minerals Corp. v. Carmen, supra,* slip op. at 3.[15]

Nevertheless, Metals argues that any change in the tin market attributable to GSA tin sales is "undue" at this time because GSA does not need the revenues from such sales in order to purchase currently authorized strategic materials for the National Defense Stockpile. In essence, Metals argues that GSA may not sell any surplus materials—all such sales will have *some* impact on the marketplace[16]—unless it presently needs funds to acquire strategic materials. While the "undue disruption" provision suggests that GSA has the authority to vary the rate at which it sells surplus materials to avoid market disruption,[17] that same provision also suggests that GSA has the authority to sell surplus materials even if the resulting revenue is not immediately required for other stockpile transactions. This reading of the "undue disruption" provision furthers its goal of minimizing market disruptions. For if GSA could not sell the surplus tin until the resulting revenues were required, it might be forced to sell the tin under circumstances which would be more disruptive to the market than result from past and present policies. Nothing in either the Strategic Materials Act or the Stock Piling Act supports imposing the limit on GSA's authority to sell the surplus tin suggested by Metals.[18]

smelter. *See* H.R.Rep. No. 96–56, 96th Cong., 1st Sess. 3 (1979); 125 Cong.Rec. S14,652 (daily ed. Oct. 16, 1979) (statement of Sen. Tower). However, these statements merely reiterate the requirements of the "undue disruption" provision of the Stock Piling Act—that GSA dispose of the surplus tin "on an orderly basis and . . . with due consideration of avoiding the disruption of normal markets of domestic producers of tin." H.R.Rep. No. 96–56, 96th Cong., 1st Sess. 3 (1979). These statements do not evidence a congressional intent to impose greater limits on the tin disposal program than imposed by the Stock Piling Act.

13. H.R.Rep. No. 96–46, 96th Cong., 1st Sess. 5 (1979) (emphasis added) ("The committee recognizes that every stockpile transaction affects the commodity market to *some* degree . . .").

14. Thus Metals argues that "the daily availability of GSA tin inherent in the off-the-shelf procedure depresses the market even when GSA makes no sales." Brief for Appellant at 20. Later Metals asserts that the "potential availability of GSA tin depresses the market even when GSA makes no actual sales." *Id.* at 34.

15. Metals has brought its complaint to the attention of Congress, urging Congress to exercise its oversight authority to review GSA's tin disposal program. To date Congress has not

seen fit to do so. Second Long Affidavit ¶ 9; Third Long Affidavit ¶ 6.

16. *See* note 13 *supra.*

17. Indeed, because of weakness in the tin market, GSA sales of surplus tin have only been at the rate of 1,800 tons per year, rather than at the rate of 10,000 tons per year anticipated when the Strategic Materials Act was passed. H.R.Rep. 96–56, *supra,* at 6.

18. In support of its argument that GSA does not need to sell tin to finance the acquisition of strategic materials, Metals provided this Court with a General Accounting Office (GAO) report dated July 16, 1982, which analyzed the administration's National Defense Stockpile plan for fiscal years 1983–1987. GAO concluded that "it appears that the administration has given priority to budgetary considerations over stockpile needs, and that the 5-year plan, if implemented, will result in the $500 million limitation on the Transaction Fund balance [50 U.S.C. § 98d(b)] being exceeded." Letter from GAO to Representative Carl Levin 2 (July 16, 1982). At oral argument, a question was raised as to whether it was necessary to remand to the district court for consideration of the GAO report. We have concluded that a remand is not necessary or appropriate in this case.

### III. CONCLUSION

Our review of the record in this case indicates, as analyzed by the district court, that GSA's decision to dispose of the surplus tin by the off-the-shelf method was not arbitrary, capricious, an abuse of discretion, or contrary to law. Rather, that record demonstrates that GSA has made considerable efforts to avoid disrupting the New York tin market while carrying out the congressional mandate to dispose of 30,000 tons of surplus tin. GSA's off-the-shelf method of disposal is the very method which Congress anticipated GSA would use, and which Congress stated had not caused undue disruption of markets in past disposal transactions. Furthermore, the reduction in the New York-Penang Market price differential complained of by Metals is not the type of impact on the market which concerned Congress when it adopted the "undue disruption" provision of the Stock Piling Act. Careful reading of Metals' claim reveals that its grievance is actually with Congress for its authorization of the sale of the surplus tin. The judgment of the district court is affirmed.

*Judgment accordingly.*

We note that Metals does not allege, nor would the record in this case support such an allegation, that GSA was disposing of the surplus tin for reasons other than national defense during the period at issue *in this case*—July, 1980 through July, 1981. Nor does Metals argue that GSA's tin sales violated the proscription of 50 U.S.C.A. § 98d(b) (West Supp.1982) during that period. Indeed, such an argument could not be made because the limitation on the Transaction Fund was not imposed by Congress until August 13, 1981. Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, tit. II, § 203(b), 50 U.S.C.A. § 98d(b) (West Supp.1982). The GAO report addresses *potential* problems with the *overall* management of the National Defense Stockpile in the future; it does not address, much less criticize, GSA's tin disposal practices during the period from July, 1980, through July, 1981. We fail to perceive its relevance to the issues presented in this case.

The record in this case amply demonstrates that GSA is aware of the limits imposed by the Stock Piling Act on its management of the National Defense Stockpile. We are confident that GSA will continue to conform its management activities to those limits. If history proves our confidence unjustified, there will be

SPOTTSWOOD W. ROBINSON, III, Chief Judge, concurring:

I join in the court's judgment and, save on one point, in its opinion. Respectfully, I disagree with the court's treatment of one aspect of appellant's submission.

In a supplemental brief[1] and again at oral argument, appellant contended that a report of the General Accounting Office, which addresses the plan for management of the National Defense Stockpile during fiscal years 1983–87, demonstrates that the activities GSA contemplates will bring about a violation of the Strategic and Critical Materials Stockpiling Act.[2] Appellant also suggested that the report indicates that GSA's tin-disposal practices during the period involved in the present case—July, 1980, through July, 1981—have been inconsistent with the interests of national defense.[3]

I agree with my colleagues that the GAO report does not speak to the question whether GSA sold surplus tin during 1980–81 for any reason unrelated to national defense,[4] and therefore that it provides no basis for disturbing the judgment under

sufficient time to deal with GSA violations of the Stock Piling Act when they occur.

1. Supplemental Brief for Appellant at 1–3.

2. The Act expressly forbids use of the stockpile for economic or budgetary purposes. 50 U.S.C. § 98b(b)(1) (1976). In furtherance of this prohibition, Congress amended the Act in 1981 to ban any disposal of surplus materials that will increase the balance in the transaction fund beyond $500 million after September 30, 1983. 50 U.S.C.A. § 98d(b) (West Supp.1982). The GAO report, rendered to the Senate Subcommittee on Preparedness of the Committee on Armed Services, notes that budgetary concerns apparently will be given priority during 1983–87, which in turn will result in an above-ceiling balance in the transaction fund. Letter from J. Dexter Peach, Director, Energy and Minerals Division, General Accounting Office, to Representative Carl Levin at 2. (July 16, 1982).

3. That, contrary to my colleagues' understanding, see Majority Opinion at note 18, is my perception of the thrust of appellant's argument.

4. See *id.*

review. I think it unwise, however, to comment on GSA's prospective disposals of tin during 1983–87.[5] The five-year management program is not before us for review, and any future challenge to it, and the relevance of the GAO report in any contest over it, should be left unprejudiced by today's decision.