**HOWES LEATHER COMPANY, INC., Plaintiff,**

v.

**Terence C. GOLDEN, Administrator, General Services Administration, et al., Defendants.**

Civ. A. No. 81–0698.

United States District Court, District of Columbia.

Dec. 23, 1987.

William J. Kenney, William A. Duerk, Frank Koszorus, Scott R. Schoenfeld, Washington, D.C., for plaintiff.

Richard Reback, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Plaintiff Howes Leather Company, Inc., a disappointed bidder, instituted this action in 1981 challenging defendants' decision in February 1981 not to accept plaintiff's bids for certain lots of excess government stockpile "quebracho," a vegetable tannin extract used in leather tanning operations. Plaintiff alleges that defendant General Services Administration ("GSA")[1] abused its discretion, acted outside the scope of its statutory authority, and violated the anti-trust laws. The matter now comes before the Court on the parties' cross-motions for summary judgment. For the reasons set forth below, the motion of defendants is granted.

## I. Factual Background

Under the Strategic and Critical Materials Stock Piling Act ("Stockpiling Act" or "Act"), 50 U.S.C. §§ 98 to 98h–4 (1951 & Supp.1987), the government stockpiles various materials, including quebracho, to ensure wartime availability. When the government supply exceeds potential wartime needs, GSA[2] is authorized to dispose of materials through formal advertising and competitive negotiation procedures. Id. § 98e(a), (b).

The National Defense stockpile of quebracho in February 1981 was 142,703 "long" tons.[3] Under congressional mandate authorizing GSA to dispose of large quantities of excess quebracho, GSA was seeking to reduce that amount to 28,000 long tons.[4] Defs.Exh. 35. In October 1980, GSA offered for sale 6000 long tons of excess quebracho,[5] located at various storage facilities around the country and

---

1. The other defendants in this action are various officials of the General Services Agency ("GSA") and of the Federal Emergency Management Agency ("FEMA"), sued in their official capacity. While FEMA has responsibility for determining which materials should included in the national stockpile and when the inventory is in excess of national security requirements, GSA is responsible for implementing those disposal decisions, including the handling of bids. Defendants' Statement of Materials Facts, at para. 4, 5.

   Plaintiff has *never* made clear its allegations against the defendants other than the GSA, *see* Complaint, at 15–16, and Plaintiff's Memorandum in Support of Motion for Summary Judgment ("Pl.Mem."), particularly in light of its stated lack of objection to the disposal rate of 6000 long tons per year, *see infra* note 5. Plaintiff also complains about the actions of agencies, such as the State Department, that are not named defendants. Neither of these issues has distracted the Court from the three central issues discussed below.

2. Congress delegated administrative and enforcement authority under the Strategic and Critical Materials Stock Piling Act to the President. In 1979, this authority was delegated to the Administrator of the General Services Administration ("GSA"). Defendants' Exhibit ("Defs.Exh.") 2 (Exec. Order No. 12155 (1979)).

   Within the GSA, responsibility for the annual rates and prices for disposal of quebracho is assumed by Stock Pile Disposal Division Director Readus B. Long. Long Affidavit, at 4.

3. A "long" ton is equivalent to 2240 pounds of quebracho.

4. In 1965 and 1971, Congress authorized the disposal of 111,457 and 35,287 long tons of quebracho, respectively, found in excess. Defs. Exh. 3 (P.L. 89–245 (Oct. 9, 1965), P.L. 92–89 (Aug. 11, 1971)). Neither statute states a timetable for disposal. As of March 1984, GSA had disposed of approximately 63,000 long tons of quebracho under the 1965 congressional mandate and none under the 1971 mandate. Defs. Exh. 38, at 107.

5. This amount of quebracho represented approximately 30% of reported domestic consumption in 1981. Defs.Facts, para. 14. While plaintiff complains about "the procedural defects in establishing that disposal rate," it states that it does *not* complain about the 6000 long tons per year rate per se. Plaintiff's Memorandum in Support of its Motion for Summary Judgment, at 30. To the extent that plaintiff challenges "procedural defects" in this regard, *id.* at 16, its brief makes clear that these are the

divided into lots, limiting each bidder to 40% of the total amount available. *See* Defs.Exh. 11 (VTE–35), 13 (amendment).[6] Bid opening was scheduled for February 3, 1981.[7]

Plaintiff, one of the nation's largest quebracho consumers, tendered sealed bids on eight specific lots of quebracho, totaling 1,627,456 pounds (or 726.5 long tons), at a price between $.1927/lb. and $.2482/lb (or a weighted average of $0.2182/lb). Defs.

Facts, para. 18. Plaintiff was the sole bidder on seven of the eight lots, and submitted the second lowest weighted average bid price of the seven firms that made offers to buy.[8]

Announcing that it had arrived at a cutoff price of $.2588/lb. for all quebracho lots, GSA did not accept plaintiff's bids and kept the lots on which plaintiff had bid available for future sale. The array of bids and awards was as follows:

| Bidder | Lots | Lbs. | Price Range |
|---|---|---|---|
| Pilar River Plate Corp. | | | |
| bid & award: | 5 | 448,514 | $.2601 – .2742 |
| Middlesboro Tanning Co. | | | |
| bid: | 5 | 1,119,977 | .2546 – .2630 |
| award: | 4 | 895,977 | .2588 – .2630 |
| L. H. Lincoln & Sons, Inc. | | | |
| bid & award: | 1 | 56,000 | .2618 |
| Pfister & Vogel Tanning | | | |
| bid: | 5 | 807,466 | .2000 – .2626 |
| award: | 2 | 457,370 | .2626 |
| Eberle Tanning Co. | | | |
| bid: | 1 | 224,000 | .2000 |
| Tannin Corp. | | | |
| award: | 2 | 117,668 | .2311 – .2511 |
| Howes Leather Co., Inc. | | | |
| bid: | 8 | 1,627,456 | .1927 – .2482 |

Defs.Exh. 23. Of the 1,965 long tons (4,401,081 pounds) of quebracho for which GSA received bids, a total of 829 long tons (1,857,861 pounds) of quebracho were sold, at a total value of $486,983.43. *Id.*

The issue of how GSA arrived at its "cut off" price is central to this litigation and deserves detailed factual exposition.

To insure that disposition of stockpiled goods is made at the market rate and does not create "undue market disruption," GSA often conducts market surveys and econometric studies to determine market prices. Markon Depo. at 40; Faulconer Depo. at 4. GSA did not, however, conduct any econometric studies as to the market ramifications of its quebracho sales or the cut-cff

*same* defects it alleges invalidate the minimum acceptable price set by GSA for the February 3, 1981 bid opening. And, to the extent that those defects are different (though they appear identical, and plaintiff has not suggested otherwise), plaintiff's contentment with the end result of that process (the 6000 long tons/year rate) renders their argument against the process used to set that rate meritless. Accordingly, the Court has not addressed plaintiff's complaints about defects in the context of GSA's setting of the annual disposal rate because plaintiff has not stated a claim in this regard.

6. The 40% limitation on the quantity that could be bid on by any one offeror was instituted by GSA to help insure relatively uniform sales over

the four bid openings in the year; unsold amounts "rolled over" into the next bid offering. Long Depo. at 76.

7. The invitation for bids, VTE–35, covered the sale of quebracho for domestic consumption for Fiscal Year 1981. Hochberg Aff., para. 5. GSA scheduled four bid openings: November 25, 1980, February 3, 1981, May 5, 1981, and July 14, 1981. *Id.* para. 13.

8. Only about eight firms buy quebracho from GSA. Hochberg Depo. at 36. Only one other bidder submitted a price for any of the lots bid on by plaintiff, and it came in with a higher bid ($0.2451/lb. compared to plaintiff's $0.2377/lb.). Defs.Exhs. 20, 23.

price selected. Faulconer Depo. at 4; Hochberg Depo. at 52, 60. Compared to more actively traded commodities,[9] for the GSA, quebracho was a "relatively small volume material" and a "low priority item." Long Depo. at 31; Faulconer Depo. at 4; Markon Depo. at 28. It is not publicly traded, there is no published trade data for it, and there are no domestic and only a few foreign producers.[10] Markon Depo. at 44; Long Depo. at 31.[11]

The individual responsible for making the initial recommendation as to the appropriate cut-off price for the February 1981 bid openings was Martha L. Hochberg, who had served since 1979 as the primary contracting specialist for vegetable tannins in the Stockpile Disposal Division of the Federal Property Resources Service of the GSA. Hochberg Aff., para. 2. Hochberg's work and recommendations were subject to the immediate review by her supervisors John R. Faulconer (program manager for the Acquisition and Disposal Branch for the Stockpile), and Readus B. Long (Director of the Stockpile Disposal Division). Id. para. 4.

In preparation for the bid opening on February 3, 1981, Ms. Hochberg "informally contacted, by telephone" nine individuals, including a representative of plaintiff, to gather information on current market conditions. Id. para. 15. She regularly conducted this type of telephone survey prior to bid openings for quebracho, asking consumers and producers to tell her any information they were willing to give on "market conditions." Hochberg Depo. at 26. She learned during the course of this survey that the quebracho producers had increased the quoted price of quebracho (solid ordinary) in mid-November 1980 from 30.75¢/lb. to 37¢/lb.[12]

After she opened the bids on February 3, 1981, Ms. Hochberg consulted with her superiors Mr. Faulconer and Mr. Long, comparing the bids with each other and with past bids received and awards made.

**9.** Markon Depo. at 112; cf. Associated Metals and Minerals Corp. v. Carmen, 704 F.2d 629, 633 (D.C.Cir.1983).

**10.** Quebracho is extracted from the heartwood and bark of the quebracho tree, which grows mainly in Argentina and Paraguay. Long Aff., para. 12. Plaintiff consistently refers to the producers as "the international cartel." Except for one such reference by Mr. Markon in his deposition, however, the record does not reflect that the other individuals at GSA involved in the handling of the quebracho bids during the relevant period used this same terminology. See Long Depo. at 88.

**11.** According to Janet B. Rollins, a market analyst with the Federal Property Resources Service, the market analysis for quebracho was also handled differently than that for other commodities because of the frequency of the bidding (quebracho had four "bid openings a year). Rollins Depo. at 31–34.

**12.** Defendants' Exhibit 19 ("Defs.Exh.") at notes of 11/14/80, 12/5/80. Hochberg's notes showed that the price was "holding" through January, 1981. Id. at notes 1/27/81 (two contacts), 1/28/81 (two contacts). One contact commented, however, that there "has been a lot of resistance to the price increase." Id. at notes 1/28/81. Notes dated 2/13/81 indicate that one contact purchased a small quantity of fresh quebracho at about 2¢ under the quoted market price of 37¢/lb. Id.

Other of Hochberg's notes reflect that while some contacts had been aware of the price increases by the producers before the bid opening, others were not. Id. at notes 11/14/80, 11/25/80, 12/10/80. In a December 5, 1980 letter to GSA, plaintiff specifically states that its bid had been made without knowledge of the producers' price increase, Defs.Exh. 18, but in notes of November 25, 1980 of a conversation with Arthur Devens of Howes Leather Co., Hochberg notes that he told her that "industry was aware" [her emphasis] of the price increase, but did not know it would become effective right before the bid opening.

Two of the contacts, including Devens, told her that they could get a discount of 1–2¢/lb. off of the published rate of 37¢/lb. Id. at notes of 12/5/80, 1/26/81 (her notes show Devens told her he could get it from one importer at slightly less than 34¢/lb., but he contends that he meant the discount was from the previous price of 30¢).

Some of the contacts suggested that a reasonable GSA price would be in the 25–27¢ range. See id. at notes 12/10/80 (a producer told her that "GSA will get no flak from him for making awards at the 25¢ level") and notes 1/27/81 ("if GSA does not accept bids in the 25–27¢ per pound range, people will have to go to the importers and buy fresh material").

Hochberg was also told by one contact that he had purchased 1000 tons of quebracho in Europe in September [1980] for delivery through March 1981 at a price of 30.5¢. Id. at notes of 12/10/80.

Hochberg Aff., para. 19. The comparisons of the bids showed that the weighted average bid was $0.23945. Hochberg Depo. at 83. Plaintiff's bids, at an average weight of $0.2182, *supra* at 8, were among the lowest received, were below the prices which GSA had accepted for quebracho for the three prior bid openings,[13] and were approximately 10.98% lower that the price at which plaintiff had been awarded approximately three million pounds of quebracho one year previous (at a weighted average of $0.2451/lb.). Long Aff., para. 19.

In addition to Ms. Hochberg's informal telephone conversations,[14] she states that the following price information was "available":

(a) The latest published price lists for quebracho (dated November 1980) from two dealers for vegetable tannin extracts, quoting 37¢/lb. for solid ordinary quebracho (Defs.Exh. 18);

(b) A confirmed price increase on November 13, 1980 of 22.3% for quebracho (Defs.Exh. 18);

(c) Market analyses (including declared value for customs purposes of imported quebracho from the Department of Commerce and the Census Bureau) performed in December 1980 and January 1981 by the Market and Technical Research Division of GSA–FPRS at the request of the Stockpile Disposal Division (Defs.Exh. 18);

(d) the Stockpile Disposal Division's receipt of and response from December 1980 through March 1981 to seventeen congressional inquiries on behalf of the tanning industry mentioning the producers' new price of 37¢/lb.;

(e) A letter dated December 8, 1980 from the Tanners' Council of America requesting a meeting with industry representatives and mentioning the recent increase in quebracho prices (Defs.Exh. 17);

(f) A letter dated January 5, 1981 from the law firm of Cleary, Gottlieb, Steen & Hamilton, counsel to the Tannin Extract Producers Federation, requesting permission to attend the meeting with industry scheduled for January 6, 1981,[15] and a second letter dated January 27, 1981 after the meeting offering comments (Defs.Exh. 17); [16]

(g) The receipt of higher bid prices by one bidder for lots of quebracho where the analytical data had been questioned and the insolubles content appeared high.[17]

Hochberg Aff., paras. 24, 32. In setting a cut-off price, GSA also kept its prices substantially lower (in the range of four to six cents per pound) than the producers' prices because of differences in quality, age, and packing (some of the GSA material had been stored for 25–30 years); the stockpile quebracho was sold on an "as is" basis with no warranty or guarantee of indicated analyses; and some of the stockpile que-

13. The range of bid prices and quantity of quebracho awarded for the four previous offerings were:

| | | | |
|---|---|---|---|
| VTE–34 | 2/26/80 | $0.2441–0.2656 | 4,191,299 lbs. |
| VTE–34 | 5/13/80 | $0.2540–0.2582 | 1,433,736 lbs. |
| VTE–34 | 9/05/80 | $0.2500–0.2571 | 575,680 lbs. |
| VTE–35 | 11/25/80 | $0.2500–0.2650 | 2,823,989 lbs. |

Long Aff., para. 22.

14. Since the bid opening in February 1981, the responsibility for making the telephone inquiries has been shifted to Janet Rollings of the Market and Technical Research Division of GSA–FPRS, but otherwise the agency's procedures for setting the cut-off price have not changed. Hochberg Depo. at 61–62.

15. Representatives from the tanning industry, including plaintiff, were present along with the Commissioner of Federal Property Resources Services Roy Markon, the Acting Assistant Commissioner for the Office of Stockpile Transactions Sebastian J. Gionfriddo, Hochberg, and her superiors Long and Faulconer. A representative of Cleary, Gottlieb Steen Hamilton was also present. Hochberg Aff., para. 27.

16. The two primary comments from the law firm on behalf of the producers were that the price increases were well-justified and that they did not believe that the quality of the GSA stockpiles was significantly less than that of fresh quebracho and that therefore this should not constitute a basis for reducing GSA's price below prevailing market rates. Defs.Exh. 17.

17. Seven of the eight lots bid on by plaintiff had low insolubles content and high tannin content. Hochberg Aff., para. 31. One had no analysis information. *Id.*

bracho was significantly lower in tannin content than fresh material. Defs.Exh. 23.

After discussing "all of the information available to us," Hochberg recommended, and Mr. Faulconer and Mr. Long approved, that bid prices for quebracho should range from $0.2588 to $0.2742 per pound (at a weighted average of $0.2621/lb.).[18] Hochberg Aff., para. 34; Defs.Exh. 23. Ms. Hochberg's written recommendation mentions the following factors in describing the "current market conditions" for quebracho: buyers have reported that they could buy from the producers at substantial discounts; sales had been minimal at the $0.37 price; imports increased slightly in 1980; sole leather production was down; domestic tanners were increasingly using substitutes for quebracho; sales of stockpile quebracho had declined in the few years previous; and GSA was surprised given strong industry interest in the stockpile that bids were not received for larger quantities. Defs.Exh. 23. The recommendation was concurred in by the GSA Office of General Counsel, the Acting Assistant Commissioner for the Office of Stockpile Transactions, and was approved by the Commissioner Roy Markon.

After learning that it would not receive any awards for that bid opening, plaintiff filed three administrative protests. All were denied. Plaintiff then filed this action on March 23, 1981, alleging that the GSA abused its discretion, that defendants failed to comply with the Stockpiling Act, and that the GSA's disposal practices violated the antitrust laws.

In October 1981, the late Judge George L. Hart dismissed the action for lack of standing and failure to state a claim. The Court of Appeals for the District of Columbia Circuit reversed and remanded for further proceedings. *Howes Leather Co., Inc. v. Carmen*, 680 F.2d 818 (D.C.Cir.1982).

After Judge Hart denied a new motion by defendants to dismiss (on the basis of mootness as the unsold quebracho lots were no longer available), the proceedings were stayed pending the outcome of settlement negotiations. The case was reassigned to this Court in 1984 after Judge Hart passed away. After discovery terminated in 1986, the parties filed the motions now before the Court.

## II. Analysis

### A. Standard of Review

In ruling on a motion for summary judgment, the Court must "view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). In this case brought under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), plaintiff bears the burden of proving that the GSA's decision not to accept its bids was "arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law."

The standard of review is "narrow" and begins with the presumption that the agency's decision is valid. *Associated Metals and Minerals Corp. v. Carmen*, 704 F.2d 629, 633 (D.C.Cir.1983). The Court may not substitute its judgment for that of the agency if there is a rational basis for the agency decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

Summary judgment is appropriate when there is "no genuine issue as to any material fact." Fed.R.Civ.P. 56. *Anderson*, 106 S.Ct. at 2511. In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 2513. At the same time, however, Rule 56 places a burden on the non-moving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S.

---

18. Ms. Hochberg actually recommended a cutoff price of $0.2600, but was overruled by Mr. Long who pointed out to her that if the cut-off price were set at $0.2588, GSA could award three additional items for 300 more long tons. Hochberg Depo. at 44.

317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Although the parties vigorously dispute the legal issues in this case, as discussed below, the material facts are essentially undisputed, and the case is properly postured for summary judgment.

## B. Whether GSA's Action Was Arbitrary and Capricious

In determining whether an agency's action was arbitrary and capricious, the Court is "obligated to restrict its inquiry to a determination of whether the ... agency's decision had a reasonable basis.... If the court finds a reasonable basis for the agency action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the ... regulations." *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971). The appropriate starting point for review then is the agency's authorizing statute.

The Stockpiling Act provides:

disposal of materials from stockpile shall be made by formal advertising or competitive negotiation procedures. To the maximum extent feasible—

(1) competitive procedures shall be used in the acquisition and disposal of such materials;

(2) efforts shall be made in the acquisition and disposal of such materials *to avoid undue disruption* of the usual markets of producers, processors, and consumers of such materials and *to*

*protect the United States against avoidable loss;*

50 U.S.C. § 98e(b) (emphasis added).

The central question in this action is whether defendants acted within this statutory mandate or whether they acted arbitrarily and capriciously in setting the cut-off price for quebracho at $0.2588/lb. in February 1981. Plaintiff contends that because GSA did not conduct any econometric or other analyses of actual market transactions, the agency's pricing decision was not based on the real market value of the stockpile and GSA did not, therefore, fulfill its statutory mandate to avoid market disruption.

Defendants respond that their selection of a cut-off price was done only after all the bids had been received, was based on references and research in the open market, and was wholly in accord with the dictates of the Stockpiling Act that, in disposing of excess stockpiles, the agency make efforts to avoid undue disruption to the market while at the same time protect the government against avoidable loss.[19]

A thorough review of the evidentiary materials submitted by the parties indicates that plaintiff's numerous attacks on the quality and integrity of GSA's analysis when taken together suggest only that the agency's analysis *could have been* more sophisticated. Plaintiff has not shown, however, that the agency lacked a rational basis for its decision to set the cut-off price where it did nor that this decision resulted in market disruption.

Many of plaintiff's complaints focus on its contention that GSA did not consider certain factors that plaintiff believed were

---

**19.** Defendants also suggest that the Court of Appeals decision in *Associated Metals and Minerals Corp. v. Carmen*, 704 F.2d 629 (D.C.Cir. 1983), upholding GSA's market analysis and price-setting procedures with regard to stockpiles of tin, is dispositive. Although helpful and authoritative in terms of its review of GSA's action generally, *Associated Metals* involved a different stockpile commodity for which GSA conducted a substantially different type of market analysis and is, therefore, not entirely applicable. (In setting prices for the tin market, GSA undertook "an elaborate analysis of tin prices in the New York market each day before setting its

acceptance price [for off-the-shelf sales]." *Id.* at 632. Specifically, GSA converted the prices in the two relevant foreign markets to "New York" prices, then considered published prices and information obtained from a telephone survey of traders, producers, and consumers. *Id.*) The court in· *Associated Metals* did, however, approve of GSA's practice of minimizing its impact on the tin market by avoiding price leadership. *Id.* As discussed below, the record indicates that GSA followed this same basic rule with regard to quebracho sales. To this extent, *Associated Metals* is controlling.

important in reaching an accurate cut-off price. A thorough review of the record shows, however, that not only did GSA consider most of these factors, but it also relied on several factors that appeared to be better indicators of the real market value of the stockpile quebracho. For example, plaintiff suggests that the producers' posted price of 37¢ was "irrelevant" in the market place because the companies were not actually trading at that level, but were in fact receiving substantial discounts. The evidence shows, contrary to plaintiff's assertion, that GSA did not "rely" on the producers' new prices in reaching the cut-off. Long Depo. at 95. It was *a* factor GSA considered, but the record does not reflect that it was given undue weight. This conclusion is underscored by the fact that GSA increased its cut-off price from the previous bid opening by only approximately 3.52%, compared to the producers' announced increase of 22.3%. Defs.Exh. 37.

Plaintiff also assails GSA for assuming that the posted price was equivalent to the market price. The record does not support plaintiff's position. GSA well-understood the difference between the dealers "posted" price and the "market" price. Long Depo. at 91; Faulconer Depo. at 13.[20] GSA was also aware that few, if any, transactions actually occurred at the posted price and that discounts were available. Faulconer Depo. at 23, Hochberg Depo. at 77. GSA also considered that the demand for quebracho was declining and that industry was looking more toward substitutes. Hochberg Depo. at 33–34. Further, GSA recognized that its product had a market value of about 15% to 25% lower than the international producers' product because the stockpiled quebracho was not "fresh" and was of variable quality. Long Depo. at 91; Faulconer Depo. at 13.

The record also shows that GSA rationally relied on the bids themselves as the best indication of the fair market value of the quebracho. Long Depo. at 73, 104; Hochberg Depo. at 100. This approach appears quite reasonable as it allows the consumers, who are most knowledgeable about actual transactions, very direct and specific influence on the agency's decision.[21]

In addition, the agency looked at its own bidding history. The cut-off price of $0.2588 was not out of line compared to GSA's cut-off prices for the four preceding bid openings ($0.2441, $0.2540, $0.2500, and $0.2500). Defs.Exh. 37; *supra* note 13. GSA noted that there was also an "upward trend" for several companies in the prices bid. Hochberg Depo. at 86. Further, GSA's clear reliance on the bids themselves also directly contradicts plaintiff's assertions that the cut-off price was "pre-established." Long Depo. at 87, 108; Hochberg Depo. at 102.

That the agency's decision was not arbitrary or capricious is also confirmed by examining the bids of other consumers and the prior awards of quebracho to plaintiff itself. The record shows that "knowledgeable bidders" had shown a willingness to pay significantly more plaintiff for the stockpile quebracho. Long Aff. at 22. And, plaintiff's bid was $0.0269 (or 11%) *less* than its award one year earlier. *Id.* para. 23.

■ One final indication that the agency's decision had a rational basis and was consistent with its statutory mandate is that plaintiff has not shown that GSA's action in setting the cut-off price in February 1981 resulted in "market disruption." That plaintiff did not receive the quebracho in the amount and at the price it desired, does not amount to "undue disruption of

---

**20.** While Ms. Hochberg did not ask in her telephone survey about "actual" market transactions (in recognition, she said, of the consumers' concerns for their competitive standing), Hochberg Depo. at 65, 67, she did not prevent them from providing this information to her or GSA, and in some instances, consumers did inform her about specific transactions or probable discounts. Notably, Hochberg spoke with a representative of plaintiff twice during this survey. *See supra* note 12.

**21.** This reliance on the bids themselves also answers plaintiff's complaint that, in setting the cut-off, GSA did not take into account variations in the quality of the quebracho. The bids, in fact, varied significantly according to the lots. *See supra* at pp. 8–9.

the usual markets of producers, processors, and consumers." 50 U.S.C. § 98e(b).

Plaintiff's real argument is that the agency did not weigh the factors in a way that resulted in an outcome favorable to plaintiff. But, balancing of permissible factors is a matter of judgment best left to the agency charged with discretion in administering the authorizing statute. *See Overton Park*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136; *Associated Metals*, 704 F.2d 629.

As an "artificial" participant in a market when there are only a small number of consumers and producers, GSA faced a formidable task in its quebracho disposal program. In requiring that the agency prevent both undue market disruption *and* avoidable loss, but placing no further restrictions on the agency, Congress well-recognized that the agency's discretion in this area must be broad. The term "undue market disruption" is difficult to define, and the agency must make a "judgment call." Long Depo. at 25, 67; Markon Depo. at 73. Ironically, defendants' success in balancing these factors can be inferred to some extent from the numerous complaints GSA received from quebracho consumers *and* quebracho producers about its disposal policies. As Readus Long, Director of the Stockpile Disposal Division, stated:

> The Tanners' Council of America, Inc., has requested that GSA offer large quantities of tannin to the market to prevent the foreign producers from increasing their price. On the other hand, the producers or their representatives allege that GSA offers too much for sale and indeed sells too much at prices that are too low. This is a general problem with all materials in the National Defense Stockpile.

Long Aff. at 8; Long Depo. at 69–70; *see also* Markon Depo. at 106.

In short, after thorough review of the record, the Court finds that while the mar-ket analysis conducted by GSA in setting the minimum acceptable price for quebracho may not have been sophisticated or elaborate, it nonetheless was soundly based on factors directly relevant to the concerns about market impact that Congress expressed in the Stockpiling Act. Accordingly, GSA's decision was rational and not "arbitrary and capricious."

## C. Compliance with the Stockpiling Act —Expeditious Disposal

The Stockpiling Act requires GSA to "provide for the *timely* disposal of materials in the stockpile that (A) are excess to stockpile requirements, and (B) may cause a loss to the Government if allowed to deteriorate." 50 U.S.C. § 98e(a)(5) (emphasis added).[22] Plaintiff claims that, ever since GSA adopted a cut-off price policy in 1977, defendants have "consistently failed to meet their statutory disposal responsibilities" by not selling more of the quebracho stockpile.

The record shows that GSA is far from selling its full authorization of excess quebracho, *see supra* note 4, and has not sold the available quantity in the past several years. For example, in 1979, of the 6000 long tons made available, GSA sold only 4,620. Long Depo. at 77; Defs.Exh. 38. In 1980, GSA sold 3,713 long tons and in 1981, it sold 3,981 (both when 6000 tons were available for bid). Long Depo. at 78; Defs.Exh. 38. Commissioner of Federal Property Resources Roy Markon characterized quebracho and the other tannins as "slow moving products," Markon Depo. at 76, but noted that the large surplus also made it even more important that GSA's quebracho supplies be "ease[d] into the market." *Id.* at 67.

The Stockpiling Act's requirement that the agency dispose of excess quebracho "expeditiously" cannot be viewed out of context. The agency must simulta-

---

**22.** Contrary to plaintiff's assertion, the Stockpiling Act does not use the word "expeditious," but instead states that disposal shall be "timely." 50 U.S.C. § 98e(a)(5). The "expeditious" language is found in the Federal Emergency Management Agency regulations, 44 C.F.R. § 328.2(n)(2), but these regulations simply add that "In general, excess materials constitute unneeded assets and shall be disposed of as expeditiously as possible." Defs.Exh. 4. *See also* GSA Policy Manual. Pl.Exh. B.

neously be concerned, as discussed above, with market impact. Plaintiff has not raised a genuine issue of material fact as to whether GSA could have sold greater quantities of quebracho without running afoul of its legislative mandate to avoid market disruption. As reflected herein, the agency must be accorded reasonable leeway in making these types of discretionary decisions. Accordingly, the Court cannot find that the agency violated its statutory mandate in disposing of the excess quebracho.

## D. Plaintiff's Antitrust Claims

Plaintiff's final claim is that GSA determined the cut-off price in a manner contravening federal antitrust laws,[23] because, according to plaintiff, GSA followed the dictates of the "International Cartel." The record does not support plaintiff's bold assertion.

██ As a threshold issue, the government, its agencies, and officials, are absolutely immune from antitrust liability per se. Plaintiff has completely failed to show that it can state a claim under the Sherman Act, 15 U.S.C. § 1. *Sea–Land Service, Inc. v. The Alaska Railroad*, 659 F.2d 243 (D.C.Cir.1981). At most, plaintiff could argue that GSA failed to comply with its statutory mandate by not taking "antitrust" implications into account when it set the cut-off price. *Sabin v. Butz*, 515 F.2d 1061, 1069 (10th Cir.1975).

While the record shows that the producers, recognized as the Tannin Extract Producers Federation ("TEPF"), *attempted* to influence the GSA through repeated contacts by the Cleary Gottlieb law firm, there is no indication that GSA gave the produc-

ers' concerns inappropriate weight. Plaintiff has produced a few circumstantial pieces of evidence that suggest that GSA's policies at times matched that desired by the "cartel," but these must be viewed together with the evidence showing that the producers more often than not were complaining about GSA's sales to domestic consumers. The producers wrote to GSA "routinely," even "religiously" complaining that GSA was selling too much quebracho at too low a price. Long Depo. at 57, 58. Contrary to plaintiff's suggestion of undue influence, the repeated contacts support the inference that GSA did *not* jump when the producers sneezed.

Plaintiff has not raised a genuine issue of fact in support of its allegation that GSA followed the producers' lead in setting the cut-off price or that contacts with the producers were somehow improper.[24] The evidence in the record is to the contrary. *See* Long Depo. at 32 ("certainly, from '77 when I had directly responsibility, I have never been approached by any other department or any other outside agent or any other country, or in any form or fashion, to establish a fixed quantity or a fixed price or a protection of the price of vegetable tannins"); Hochberg Depo. at 53–54 (she never contacted Cleary Gottlieb "for any purpose"; to the contrary, they, as other individuals did, contacted her to find out when material would be offered and when bids would be published).

It is evident that while the "posted" prices quoted by the domestic sellers for the TEFP were *a* factor in GSA's determination of the cut-off price, they were not *the* determining factor. Long Depo. at 90 ("but I should highlight, again, that [the

---

**23.** Plaintiff also adds that it believes defendants have violated the relevant competitive bidding procedures and procurement regulations. Neither of these allegations has proven to have any foundation independent of the plaintiff's allegations about the agency's setting of the cut-off price. Plaintiff's allegations that defendants did not comply with "procurement" regulations is particularly frail as the transactions at issue clearly involve disposal and not procurement; the two procedures are administratively and legislatively distinct. Even assuming that plaintiff is referring to "disposal" regulations, its argument is still unavailing as those regulations

have not yet been proposed by GSA or codified. Long Depo. at 120.

**24.** The only evidence submitted by plaintiff, outside the administrative record, of contact by producer countries was with the State Department and not GSA. *See* Pl.Exh.D. While the State Department "responded" to the concerns expressed by the embassies of some of the producer countries, plaintiff has not shown how this was collusive or that the State Department somehow, in turn, improperly influenced GSA.

dealers posted] price has among the least influence on what we establish as a cut-off. There is nothing that overrides the bid—"); Hochberg Depo. at 44.

Accordingly, the Court finds no basis for plaintiff's allegations that defendants somehow violated antitrust policies in setting the cut-off price.

### III. Conclusion

In conclusion, the record demonstrates that GSA had a rational basis for its decision to set a minimum cut-off price at $0.2588/lb. for the February 3, 1981 bid awards of excess stockpile quebracho. While it is fair to say that the agency's analysis was not elaborate, certain characteristics of the quebracho market limited GSA's ability to conduct a more thorough market survey, and the factors it did rely on in setting the cut-off price, including the bids themselves and the agency's prior awards, were reasonably indicative of the fair market value of the quebracho. Plaintiff has not raised a genuine issue of fact to support its contention that the agency's actions resulted in "undue market disruption." Similarly, plaintiff's claims that the agency failed to expedite disposal and violated the antitrust laws in making the awards are not supported by the record.

Accordingly, there being no genuine issues of material fact, and finding that defendants did not violate the Administrative Procedure Act, complied with their statutory mandate, and did not violate antitrust laws or policies, summary judgment in favor of defendants is mandated. The plaintiff's motion for summary judgment is denied.

IT IS SO ORDERED.

### JUDGMENT

In accordance with the Memorandum Opinion issued this date, judgment is entered in favor of defendants, Terence C. Golden, Administrator, General Services Administration, Roy Markon, John R. Faulconer, Bernard T. Gallagher, and Richard Corder, and against plaintiff, Howes Leather Company, Inc.