**Leon SLOAN, Sr. and Jimmie Lee Furby, Appellants,**

v.

**DEPARTMENT OF HOUSING & URBAN DEVELOPMENT, et al., Appellees.**

No. 99–5146.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 11, 2000.

Decided Nov. 14, 2000.

James K. Kearney and Joseph L. Luciana, III argued the cause for appellants. With them on the briefs were James P. Gallatin, Jr., David T. Case, and A. Thomas Morris.

Scott S. Harris, Assistant United States Attorney, argued the cause for appellees. With him on the brief were Wilma A. Lewis, United States Attorney, and R. Craig Lawrence, Assistant United States Attorney.

Before: EDWARDS, Chief Judge, HENDERSON and GARLAND, Circuit Judges.

Opinion for the Court filed by Chief Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Chief Judge:

Appellants Leon Sloan, Sr. and Jimmie Lee Furby were partners and owners of J&L Renovation Company ("J&L"), a small demolition contracting company specializing in interior demolition. On August 18, 1995, they received a notice from the United States Department of Housing and Urban Development ("HUD") that the agency was seeking debarment of Sloan, Furby, and J&L from government contracting for a period of five years based upon allegations of improper clean-up and disposal of waste at a public housing construction site. HUD issued suspensions pending a final determination on the debarment action. In August 1996, a HUD Administrative Law Judge ("ALJ") denied the five-year debarment and terminated the suspensions. The ALJ, however, declined to void the suspensions *ab initio*, and the Secretary of HUD affirmed this decision.

Sloan and Furby sought relief in the District Court, claiming that the agency's failure to void the suspensions *ab initio* violated the Administrative Procedure Act ("APA"), and that the actions of various

HUD officials deprived them of due process. In a second complaint against individual HUD officials, Sloan and Furby sought damages under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The District Court, after consolidating the cases, entered an order dismissing the consolidated complaint. In a related, unconsolidated case, Sloan and Furby brought claims pursuant to the Federal Tort Claims Act ("FTCA"). Appellants' FTCA claims are the subject of a separate appeal, *Sloan v. United States Department of Housing and Urban Development,* No. 99–5145, heard on the same day as this case.

Appellants raise two principal issues in the instant appeal. Appellants' first claim is that HUD's refusal to void their suspensions *ab initio* was arbitrary and capricious. Appellee HUD contends that there was ample evidence to support the suspensions at the time they were imposed, as well as when the case was heard by the ALJ. We disagree. HUD originally had based the issuance of the suspensions on three distinct charges. The debarment proceeding conclusively revealed that the first and third charges—relating to hazardous waste containment—were completely unsupported. Furthermore, the ALJ did not find, and HUD does not argue, that the second charge alone—relating to improper disposal of construction debris—would have supported issuance of the suspensions. Finally, the Secretary's decision is devoid of any good reason to justify the denial of the relief sought by appellants. On this record, we hold that the agency's failure to void the suspensions *ab initio* was arbitrary and capricious.

Appellants' second claim challenges the District Court's finding that the APA's comprehensive remedial structure precludes recognition of appellants' *Bivens* claims. We need not reach this issue, however, because we reject appellants' claim that individual HUD defendants violated their constitutional rights to due process in conducting and supervising the investigations and prosecution associated with the suspensions and debarment proceedings. We therefore affirm the judgment of the District Court dismissing the *Bivens* claims.

## I. BACKGROUND

### A. Factual Background

In 1989, the Allegheny County Housing Authority ("ACHA") received funds from HUD to perform modernization work at the Burns Heights public housing project in Duquesne, Pennsylvania. Part of the funding was intended for lead-based paint testing at the site. Because a previous x-ray fluorescence ("XRF") test for lead-based paint had proven inconclusive, ACHA prepared specifications calling for the demolition contractor to assume all existing painted surfaces contained lead-based paint.

In November 1992, Mistick Construction, PBT ("Mistick"), in conjunction with its bid for demolition work at Burns Heights, reviewed ACHA's XRF test and hired an industrial hygienist to perform a toxic characteristic leaching procedure ("TCLP") test of Burns Heights wall debris. The TCLP test established that the lead content of the wall debris was substantially less than the United States Environmental Protection Agency ("EPA") threshold for hazardous waste. ACHA subsequently hired Mistick to perform the demolition work.

In January 1993, before beginning the demolition work, Mistick conducted a test of the air inside the Burns Heights buildings to determine whether hazardous levels of lead were present. The air test results indicated that lead levels were significantly less than the Occupational Safety & Health Administration ("OSHA") limit; Mistick therefore concluded that OSHA worker protection requirements need not be followed when work was done on the site. Mistick provided the TCLP and air test results to ACHA, and ACHA con-

firmed that hazardous lead-based paint protocols were not required for demolition work at Burns Heights. The parties agreed, in writing, that the test results were "well within EPA guidelines" and that demolition waste from Burns Heights need not be disposed of as contaminated waste. Mistick Inc. Proposed Hazardous Materials Work Plan for the Burns Heights Project (Jan. 7, 1993), *reprinted in* Appendix ("App.") 416, 419.

In February 1993, Mistick subcontracted the interior demolition work at Burns Heights to J&L, the company owned by appellants Sloan and Furby. From February 1993 until May 1995, when J&L completed its demolition work, J&L disposed of most of its demolition debris in dumpsters provided by Mistick. For a period beginning in 1994, however, J&L began separating plaster from other demolition debris and delivering it to an unapproved landfill (the "Perrone site"). Under the then applicable Pennsylvania regulations, plaster was defined as construction/demolition waste which had to be dumped in an approved landfill. *See* 25 PA.CODE § 271.1 (1999) (adopted April 8, 1988, effective April 9, 1988). Appellants were unaware of the change in state regulations. *See Matter of Sloan,* HUDBCA Nos. 96–C–106–D3, 96–C–107–D4, 96–C–108–D5, 1996 WL 506267 (H.U.D.B.C.A. Aug. 30, 1996) (ALJ determination) (finding that appellants "would not have dumped the plaster debris in an unapproved landfill if they had been aware of the change in state regulations").

Upon discovering that a rival construction group was following and taping J&L's dumping activities, Mistick requested J&L to discontinue disposing of plaster at the unapproved site, which J&L did. Mistick subsequently informed the Pennsylvania Department of Environmental Protection ("Pennsylvania DEP") of the placement of plaster at the Perrone site. The Pennsylvania DEP determined that no action was required.

In November 1994, during an unrelated HUD debarment proceeding, HUD received information that Mistick was not properly performing lead-based paint abatement at Burns Heights. Thereafter, two HUD officials, Mark Chandler, an auditor in HUD's Office of Inspector General, and Dane Narode, an attorney from HUD's Office of Public and Indian Housing, began investigating the demolition work at Burns Heights. Chandler conducted the performance audit.

Chandler and Narode visited the Perrone site, where they observed paint chips resembling those from the Burns Heights project before allegedly being chased from the site by its owner. Chandler and Narode also visited Burns Heights where they photographed J&L's failure to contain dirt, dust, and paint chips. Chandler then spoke with Furby on the telephone and also met with David McLean, Director of Maintenance and Development for ACHA. During the latter conversation, McLean mistakenly indicated that Burns Heights was an ACHA lead-based paint project. Chandler did not inquire as to whether there were hazardous levels of lead at Burns Heights nor whether lead-based paint abatement was being performed there.

Subsequent to his meeting with McLean, Chandler received from ACHA copies of the XRF test, the November 1992 TCLP test, and the January 1993 air test. These tests clearly indicated that there were no hazardous levels of lead present at Burns Heights, but Chandler was not qualified to interpret or evaluate the test results. Amazingly, Chandler did not ask either ACHA or Mistick what the test results meant and he never spoke to Mistick or J&L about whether the subcontract covered lead-based paint abatement. Chandler's final audit report, which was sent to HUD's Pittsburgh Area Office on October 18, 1995, stated, without good basis, that Mistick and J&L had failed to properly perform lead-based paint abatement; on this erroneous finding, Chandler's report

concluded that Mistick and J&L had not performed demolition work at Burns Heights in accordance with contractual requirements.

## B. Administrative Proceedings

On August 18, 1995, three months after the demolition work at Burns Heights had been completed, Assistant Secretary for Public and Indian Housing Joseph Shuldiner notified Sloan and Furby that they were suspended from all HUD-related government contracting work and that HUD was seeking a five-year debarment from participation in HUD-funded construction work. The notice asserted that the Department had information "indicating serious irregularities in [J&L's] business dealings with the Government," namely: (1) improper cleanup of waste from the lead-based paint abatement process; (2) improper disposal of construction debris from the demolition; and (3) failure to adhere to contract requirements or HUD Guidelines by allowing hazardous waste to be tracked outside of containment and allowing workers to perform abatement work without proper notification. *See* Letters from Joseph Shuldiner, Assistant Secretary, HUD, to Jimmie L. Furby, Leon Sloan, Sr., and J&L Renovation Company (Aug. 18, 1995), *reprinted in* App. 151, 153, 155. George Dickey, a HUD Program Official in the Office for Public and Indian Housing, processed the sanctions against Mistick and J&L.

Appellants contend that, during discovery for the debarment proceeding, they requested depositions of Assistant Secretary Shuldiner and Dickey. HUD opposed the depositions and the ALJ denied the requests. Appellants also aver that, during discovery, HUD failed to produce an exchange of letters confirming that ACHA did not find "sufficient grounds to pursue a claim for non-performance, and that contamination and associated costs are nonexistent." *See* Letter from George Arendas, Executive Director, ACHA, to Paul LaMarca, HUD Pittsburgh Area Office (Jan. 17, 1995), *reprinted in* App. 174. Appellants argue that the failure to produce these "exculpatory documents" hindered their efforts at the debarment proceeding. *See* Appellants' Br. at 14.

On August 30, 1996, after a five-day administrative hearing, the ALJ rejected the Government's case seeking debarment and terminated the suspensions against J&L, Sloan, and Furby. *Matter of Sloan,* 1996 WL 506267 (ALJ determination). The ALJ specifically found that "there was not a lead hazard present at Burns Heights that would have made lead-based paint abatement protocols necessary." *Id.* The ALJ, however, denied Sloan and Furby's request to have their suspensions voided *ab initio*. The ALJ's decision not to void the suspensions *ab initio* was based on an erroneous finding that the written contract documents required Mistick to treat the job as though there were hazardous levels of lead present at Burns Heights. *See id.* After unsuccessfully appealing the ALJ's ruling to the HUD Secretary, Sloan and Furby filed suit in the District Court.

## II. ANALYSIS

### A. The APA challenge

The disputed suspension and debarment actions in this case arose pursuant to the federal regulations implementing section 3 of Executive Order 12549, 51 Fed.Reg. 6370 (1986), which provides that, to the extent permitted by law, Executive departments and agencies shall participate in a government-wide system for nonprocurement debarment and suspension. 24 C.F.R. § 24.100(a) & (b) (1995). Under the applicable regulations, debarment and suspension are discretionary measures taken to protect the public interest and to promote an agency's policy of "conduct[ing] business only with responsible persons." 24 C.F.R. § 24.115(a) (1995). The issuance of a suspension is a "serious action," hence it "may be imposed only when: (1) [t]here exists adequate evidence of one or more of the causes set out in

§ 24.405, and (2) [i]mmediate action is necessary to protect the public interest." 24 C.F.R. § 24.400(b) (1995); *see also* 24 C.F.R. § 24.405 (1995). A party who contests a suspension or possible debarment may request a hearing before an ALJ pursuant to 24 C.F.R. § 24.313 (1995), followed by an appeal to and discretionary review by the Secretary pursuant to 24 C.F.R. § 24.314(c) (1995). Any review taken by the Secretary "shall be based on the record of the initial hearing [before the ALJ] and shall fully recite the evidentiary grounds upon which the Secretary's determination is made." 24 C.F.R. § 24.314(e) (1995).

The parties agree that judicial review of the Secretary's final decision in this case is available pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 704, 706 (1994). Appellants contend that the agency's refusal to void their suspensions *ab initio* was arbitrary and capricious and thus violated § 706(2)(A) of the APA, and that the agency's administrative procedures infringed their due process rights in violation of § 706(2)(B) of the APA. We find merit in appellants' first claim.

 Neither party contests the applicability of the APA's "arbitrary and capricious" standard. Appellee urges, nonetheless, that our review of HUD's decision in the instant case should be "highly deferential," and "presume the validity of agency action." *See* Appellees' Br. at 15 (quoting *Kisser v. Cisneros*, 14 F.3d 615, 618 (D.C.Cir.1994)). It is well-established that, when conducting review under the "arbitrary and capricious" standard, a court may not substitute its judgment for that of agency officials; rather, our inquiry is focused on whether "the agency [ ] examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). Our deference to agency decisionmaking does not require us, however, to countenance an agency's failure to "consider[ ] . . . relevant factors" or "clear error[s] of judgment." *Id.* (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)).

On the basis of the record before us, we find that HUD's decision not to void the suspensions *ab initio* cannot withstand review, because the decision cannot be squared with the applicable regulations and, also, because the decisions of the ALJ and the Secretary fail to "articulate a satisfactory explanation for [the agency's] action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 (quoting *Burlington Truck Lines, Inc.*, 371 U.S. at 168, 83 S.Ct. 239).

Under the applicable regulations, a suspension is justified *only* when there is "adequate evidence" of wrongdoing *and* "immediate action is necessary to protect the public interest." 24 C.F.R. § 24.400(b). "In assessing the adequacy of the evidence, the agency should consider how much information is available, how credible it is given the circumstances, whether or not important allegations are corroborated, and what inferences can reasonably be drawn as a result." 24 C.F.R. § 24.400(c) (1995). Moreover, the agency's "assessment should include an examination of basic documents such as grants, cooperative agreements, loan authorizations, and contracts." *Id.* In applying these regulations, the ALJ and the Secretary are required to consider both whether there is adequate justification for the suspensions at the time they are issued, and whether, in light of the evidence adduced at the debarment hearing, there is good reason to terminate the suspensions. *See* 24 C.F.R. §§ 24.313, 24.314 (1995).

Many years ago, in *Horne Brothers, Inc. v. Laird,* 463 F.2d 1268 (D.C.Cir.1972), Judge Leventhal had occasion to construe what it means for an agency to have "adequate evidence" to justify the "suspension" of a government contractor:

> The "adequate evidence" showing need not be the kind necessary for a successful criminal prosecution or a formal debarment. The matter may be likened to the probable cause necessary for an arrest, a search warrant, or a preliminary hearing. This is less than must be shown at the trial, but it must be more than uncorroborated suspicion or accusation.

*Id.* at 1271. Obviously, as *Horne Brothers* suggests, "[a] question of judgment is involved" in any agency decision to issue a suspension. *Id.* What is noteworthy here, however, is that, under the controlling regulations, there can be no suspension without "adequate evidence," the necessity of "immediate action...to protect the public interest," a consideration of "whether or not important allegations are corroborated," "an examination of basic documents," and a determination, based on "all available evidence," that reasonable inferences of wrongdoing can be drawn. 24 C.F.R. §§ 24.400, 24.410 (1995).

■ At the hearing before the ALJ, the Government withdrew the third ground for debarment and suspension—failure to adhere to contract requirements or HUD Guidelines—recognizing that the agency had nothing concrete upon which to justify this charge. The ALJ subsequently dismissed the first charge—improper cleanup of waste from the lead-based paint abatement process—finding no basis in the record. *Matter of Sloan,* 1996 WL 506267 (ALJ determination). This left only the charge that J&L had improperly disposed of construction debris from the demolition. The ALJ did not find, and appellee does not argue, that this single remaining charge provided cause for the suspensions. Rather, appellee asserts that the decision not to void the suspensions *ab initio*

should be upheld because the administrative judge found appellants and Mistick largely to blame for the misunderstandings leading to the faulty audit and resulting sanctions. The suggestion that appellants should bear the onus of HUD's poor investigatory work is ridiculous. Had HUD officials been more precise in their investigation, they would have discovered that the November 1992 TCLP test and the January 1993 air test clearly established that there were no hazardous levels of lead present at Burns Heights. The auditor had only to examine the test results or request assistance with their interpretation.

We also reject appellee's related argument, that the decision not to void the suspensions *ab initio* rests on the ALJ's conclusion that government investigators had been misled into thinking that lead abatement was part of the disputed contract because the change in contract specification regarding lead abatement had not been captured in a written amendment. *See* Appellees' Br. at 20–21. The ALJ's finding on this point is simply wrong; the record is clear that the parties had agreed in writing that demolition waste from Burns Heights need not need be disposed of as contaminated waste. *See·* Mistick Inc. Proposed Hazardous Materials Work Plan for the Burns Heights Project, *reprinted in* App. 416, 419 (Jan. 7, 1993).

Whatever agency officials may have thought about the case against the appellants when the suspensions were issued, their view of the case should have changed rather dramatically following the hearing before the ALJ. The hearing made it clear that the initial finding of probable cause was flimsy at best, riding on the heels of a hastily-conducted and technically-flawed audit. In other words, even if HUD officials thought they had more than "uncorroborated suspicion or accusation" at the time when the suspensions were issued, it was abundantly clear at the conclusion of the hearing that there had been no basis at the outset to suspend appel-

lants. It was therefore arbitrary and capricious for the agency to deny full relief to appellants.

Government contracting has become an economic mainstay for a number of commercial enterprises. It goes without saying, therefore, that disqualification from government contracting is a very serious matter for these businesses. *See Gonzalez v. Freeman*, 334 F.2d 570, 574 & n. 5 (D.C.Cir.1964). In this case, appellants have endured economic losses, professional indignities, and injuries to their reputations, and these sufferings no doubt will continue to linger so long as appellants are tarnished by an official record suggesting that they engaged in "serious irregularities" in their business dealings with the Government. Even the applicable regulations recognize the potentially harsh consequences that flow from suspension, for they make it clear that "[s]uspension is a serious action" that should be imposed only "when it has been determined that immediate action is necessary to protect the Government's interest." 24 C.F.R. § 24.410(c).

In this case, appellants' claim for relief was sufficiently compelling that the Secretary granted review specifically to consider the following question: "Under what circumstances is it appropriate for the Secretarial designee to void a suspension *ab initio* when, in hindsight, it is clear that the Respondents are not guilty of the charges that led to the suspension?" *Matter of Sloan*, HUDBCA Nos. 96–C–106–D3, 96–C–107–D4, 96–C–108–D5 (Nov. 18, 1996) (order granting respondent's petition for secretarial review); *see also Matter of Sloan*, HUDBCA Nos. 96–C–106–D3, 96–C–107–D4, 96–C–108–D5 (Dec. 18, 1996) (order on Secretarial review), *reprinted in* App. 452 n.1. It is not surprising that the Secretary accepted discretionary review of the appellants' administrative appeal, for the Secretary's decision does not doubt the availability of the relief sought by appellants. *See Matter of Guillen*, HUDBCA No. 91–7008–D99, 1992 WL 45853

(H.U.D.B.C.A. Feb.28, 1992) (ALJ determination). What is surprising, however, is the Secretary's treatment of appellants' claim.

■ It is clear that there was no need for "immediate action" to be taken against appellants. *See* 24 C.F.R. § 24.400(b)(2). The Secretary's decision does not suggest that appellants should have been suspended for the allegations that prompted the first and third charges. And the Secretary acknowledges that appellants' alleged improper activity in connection with the second charge—placing debris in an unapproved landfill—had ceased *before* the issuance of the suspensions. In other words, the Secretary could not find that there was adequate evidence that appellants lacked "present responsibility" when the suspensions were issued. Nonetheless, the Secretary's decision suggests that appellants' "past irresponsible acts" in connection with the second charge justified the suspensions. *See Matter of Sloan* (order on Secretarial review), *reprinted in* App. 454. This is a specious conclusion. First, the Secretary's decision simply ignores the requirement that there must be a *real need for immediate action to protect the public interest* in order to justify a suspension. Furthermore, as noted above, the Government does not contend that the second charge against appellants, without more, could have warranted suspensions, so the Secretary's reason for refusing to void the suspensions *ab initio* makes no sense.

The Secretary's decision is at best a half-hearted attempt to address appellants' claim for relief. And, as is true with portions of the ALJ's decision, the Secretary's decision seems to blame the appellants for the blunders committed by agency investigators. In short, the decision fails to "articulate a satisfactory explanation for [the agency's] action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 (quoting *Burlington Truck Lines, Inc.*, 371 U.S. at 168, 83 S.Ct.

239). Accordingly, we find the agency's action to be arbitrary and capricious.

■ Because we find that the decision not to void the suspensions *ab initio* was arbitrary and capricious, we need not linger on appellants' alternative argument that HUD violated the due process rights of Sloan and Furby by failing to produce critical witnesses and HUD documents. "An agency may not impose even a temporary suspension without providing the 'core requirements' of due process: adequate notice and a meaningful hearing." *Commercial Drapery Contractors, Inc. v. United States,* 133 F.3d 1, 6 (D.C.Cir. 1998); *see also Reeve Aleutian Airways, Inc. v. United States,* 982 F.2d 594, 595, 599–602 (D.C.Cir.1993). In the instant case, the procedures followed by HUD adequately safeguarded appellants' due process rights.

## B. The *Bivens* claims

In asserting their *Bivens* claims for money damages against individual HUD defendants, appellants charge that HUD officials violated their due process rights in conducting and supervising the audit, processing and issuing the sanctions, and prosecuting the suspensions. The District Court held that any *Bivens* remedy was precluded by the availability of relief under the APA. Examining the APA, the District Court found it to be a comprehensive remedial scheme for administering public rights which did not inadvertently omit damage remedies for certain claimants.

We need not decide whether the APA precludes appellants' *Bivens* claims, because we find that appellants have failed to allege the violation of a constitutional right. The focus here, in contrast to the APA claim, is on the investigation into appellants' alleged misdeeds as well as the decisions to process and enforce the administrative sanctions—not the resulting records of suspension. Indeed, with the exception of the claim against Attorney Narode for prosecution of the administra-

tive action, all of appellants' *Bivens* claims center mainly on the investigations conducted *before* the administrative hearing.

■ Appellants maintain that the disputed investigations and prosecution by government officials violated their due process rights. The law is clear, however, that "there is no constitutional right to be free of investigation," *United States v. Trayer,* 898 F.2d 805, 808 (D.C.Cir.), *cert. denied,* 498 U.S. 839, 111 S.Ct. 113, 112 L.Ed.2d 83 (1990), and appellants have not shown that the investigation was part of a scheme or conspiracy to deprive them of their constitutional rights. *See, e.g., Anthony v. Baker,* 767 F.2d 657, 662 (10th Cir.1985).

■ Appellants contend that individual HUD employees contravened the broad standards incorporated in HUD's Consolidated Audit Guide for Audits of HUD Programs, but these alleged violations do not support a claim for denial of due process. *See, e.g., Schweiker v. Hansen,* 450 U.S. 785, 789, 101 S.Ct. 1468, 67 L.Ed.2d 685, *reh'g denied,* 451 U.S. 1032, 101 S.Ct. 3023, 69 L.Ed.2d 401 (1981) (stating that Social Security Administration claims manual, as opposed to official regulations, had no legal force); *Kugel v. United States,* 947 F.2d 1504, 1507 (D.C.Cir.1991) (department guidelines "do not create a duty in favor of the general public"); *Lynch v. United States Parole Comm'n,* 768 F.2d 491, 497 (2d Cir.1985) (finding that Police Commission internal procedures manual did not create due process rights enforceable in court). We therefore conclude that the errors committed by HUD officials during their investigation of appellants did not rise to the level of constitutional infringement.

■ Furthermore, as noted above, appellants were given clear notice of the charges against them and a fair opportunity to prepare a defense; they were then afforded extensive rights to a full hearing before an ALJ, during which the Govern-

ment carried the burden of proof, followed by an appeal to the Secretary and then judicial review. In other words, they were given a full panoply of due process protections to redress any preceding mistakes that may have occurred during the agency investigations. Assuming, *arguendo*, that appellants had cognizable property or liberty interests justifying due process protections, *see, e.g., Old Dominion Dairy Prods. v. Secretary of Defense*, 631 F.2d 953 (D.C.Cir.1980), the postdeprivation procedures provided under HUD regulations were more than enough to satisfy the requirements of procedural due process. *See Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *see also Stuto v. Fleishman*, 164 F.3d 820, 825 (2d Cir.1999) (quoting *Hudson*, 468 U.S. at 533, 104 S.Ct. 3194) ("[T]he negligent or intentional deprivation of property through the random and unauthorized acts of a state or federal employee does not constitute a deprivation of due process if 'a meaningful postdeprivation remedy for the loss is available.' ").

■ Finally, appellants' claims against Attorney Narode for prosecution of the administrative sanctions fail because of absolute immunity. *See Butz v. Economou*, 438 U.S. 478, 516–17, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Imbler v. Pachtman*, 424 U.S. 409, 424–29, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). In *Butz*, the Court held that, in general, federal executive officials charged with constitutional violations were entitled only to qualified immunity. *See Butz*, 438 U.S. at 507, 98 S.Ct. 2894. The Court noted, however, that there were "some officials whose special functions require[d] a full exemption from liability," *id.* at 508, 98 S.Ct. 2894, and observed that the adjudicatory process within federal administrative agencies "share[d] enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages." *Id.* at 512–13, 98 S.Ct. 2894. Finding "no substantial difference between the function of the agency attor-

ney in presenting evidence in an agency hearing and the function of the prosecutor who brings evidence before a court," *id.* at 516, 98 S.Ct. 2894, the Court granted absolute immunity to federal attorneys whose duties in administrative proceedings were functionally similar to those of a prosecutor. *See id.* at 517, 98 S.Ct. 2894. We recognize *a fortiori* that the actions taken to enforce the sanctions against Sloan and Furby, such as presenting evidence at the administrative hearing, deserve no less protection from suit.

In view of our conclusion that appellants have not alleged the violation of a constitutional right, we need not determine whether appellants' *Bivens* claims are precluded by the APA. This court has suggested that a *Bivens* action may be foreclosed where the possibility of judicial review under the APA, along with other "statutes, executive orders and regulations," provides a meaningful remedy. *Krodel v. Young*, 748 F.2d 701, 712–13 & 712 n. 6 (D.C.Cir.1984), *cert. denied*, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985). The Government, however, did not suggest that *Krodel* was applicable here.

### III. CONCLUSION

For the foregoing reasons, the judgment of the District Court is affirmed in part and reversed in part. The agency's refusal to void appellants' suspensions *ab initio* was arbitrary and capricious and is accordingly reversed. The case is hereby remanded to the agency with instructions to make void appellants' suspensions *ab initio*.

*So ordered.*