CHAMBER OF ARGENTINE–PARAGUAYAN PRODUCERS OF QUEBRACHO EXTRACT, et al., Plaintiffs,

v.

Cornel A. HOLDER, Administrator, Defense National Stockpile Center, et al., Defendants.

No. CIV.A. 04–0426ESH.

United States District Court, District of Columbia.

Aug. 5, 2004.

Kurt E. Blase, O'Connor & Hannan, LLP, Washington, DC, for Plaintiffs.

Brian J. Sonfield, Washington, DC, for Defendants.

### MEMORANDUM OPINION

HUVELLE, District Judge.

Plaintiffs, the Chamber of Argentine–Paraguayan Producers of Quebracho Extract and the Chamber's two members, Unitan and Indunor, seek to enjoin the Defense National Stockpile Center from selling its stockpiled quebracho, alleging that such sales violate the Strategic and Critical Materials Stock Piling Act, 50 U.S.C. §§ 98 *et seq.* (the "Stock Piling Act"). Defendants have moved for summary judgment, claiming that their sales decisions were not arbitrary or capricious, but instead had a rational basis as required by the Administrative Procedures

Act, 5 U.S.C. § 706(2)(A). Because the government has failed to demonstrate the basis for its decision that its proposed sales would not unduly disrupt the quebracho market, the Court will enter judgment on behalf of plaintiffs and remand to the agency for further action consistent with this Opinion.

### BACKGROUND

Quebracho is an extract from the South American quebracho tree and is used for tanning leather, primarily for shoe soles. The members of the Chamber operate three quebracho factories and are the only quebracho producers participating in international markets. The United States Department of Defense's National Defense Stockpile, which retains strategic and critical materials in an effort to preclude United States' dependence upon foreign nations for supplies in the event of a national emergency, acquired a significant amount of quebracho from South America during the Korean War. *See* Stock Piling Act, 50 U.S.C. §§ 98 *et seq.* Beginning in 1993, Congress authorized the Defense National Stockpile Center (DNSC) to relinquish its supply of quebracho, as it was *no longer needed for defense purposes.*[1] Stockpiled materials are usually disposed of by sale on the commodities market, but the funds earned from such sales are generally only to be used for the acquisition, maintenance, and disposal of materials in the stockpile. *See id.* § 98h(b)(2).

The Stock Piling Act requires the government, when disposing stockpiled materials, to make efforts "[t]o the maximum extent feasible . . . to avoid undue disrup-

---

1. Four separate public laws have together authorized the sale of the entire inventory of stockpiled quebracho. (*See* Def.'s Facts ¶ 2 (citing Department of Defense Authorization Act of 1985, Pub.L. 98–525, § 902 (1984); National Defense Authorization Act for Fiscal Year 1987, Pub.L. 99–661, § 3204 (1986); National Defense Authorization Act, Fiscal Year 1989, Pub.L. 100–456, § 1501 (1988); and National Defense Authorization Act for Fiscal Year 1993, Pub.L. 102–484, § 3302 (1992)).)

tion of the usual markets of producers, processors, and consumers of such materials and to protect the United States against avoidable loss." *Id.* § 98e(b)(2). Pursuant to the Act, the DNSC prepares an Annual Materials Plan (AMP) each year regarding the commodities in the stockpile. *See id.* § 98h–2(b). The AMP includes an upper limit on the quantity of stockpiled materials that may be disposed of each fiscal year. The Market Impact Committee (MIC), co-chaired by representatives from the Department of State and the Department of Commerce, makes recommendations as to the AMP limits and provides advice about how to dispose of stockpiled commodities consistent with the Act. *See id.* § 98h–1(c).

The AMP began listing quebracho as a commodity in 1993. Between 1993 and 2001, DNSC sold between 689 and 5000 long tons (LT) [2] of quebracho annually, which amounted to between 1% and 7% of the world market. (*See* Def.'s Facts ¶ 4.) In May 2000, when the stockpile still had approximately 100,000 LT of quebracho, DNSC initiated a study to analyze the cost effectiveness of continuing quebracho sales compared to disposing of the remaining quebracho by burying it. (*See* Deister Dec. ¶ 10.) The resulting Business Case Analysis (BCA), finalized in December 2000, considered nine alternatives for the disposition of the remaining quebracho. (Def.'s Facts ¶ 7.) While the BCA's recommended course of action was to landfill the entire quantity in one year, DNSC could not afford to devote the funds to burying all the quebracho at one time. (Deister Dec. ¶ 13–14.) Instead, DNSC proposed, and MIC approved, AMP quantities for 2001 and 2002 of 50,000 LT each year, maintaining authority each year to sell 10,000 LT and to bury 40,000. (*Id.* ¶ 14; *see*

*also* Administrative Record (hereinafter "AR") 143–45 [April 25, 2001 letter from MIC co-chairs to DNSC].) This AMP quantity, with the same restrictions, was also approved for 2003. (*See* AR 152–55 [December 18, 2001 letter from MIC co-chairs to DNSC].)

Since the government began selling its stockpiled quebracho, it had been communicating with the Chamber, and the Argentine Embassy on behalf of the Chamber, regarding the Chamber's concerns relating to DNSC's participation in the quebracho market. (*See* Deister Dec. ¶ 3; AR 1–110, 1359–1432.) In the course of this correspondence, MIC informed the Argentine Ambassador of DNSC's plan to bury 80,000 LT of the stockpiled quebracho and sell the remaining 20,000 LT. (*See* April 26, 2001 letter from MIC to Argentine Ambassador.) The Chamber subsequently offered to purchase DNSC's stockpiled quebracho for sale, reiterating its previously expressed concern that "[u]nder the present conditions of international recession and severe economic problems in Argentina, any significant disposal [of quebracho by DNSC] would present severe economic consequences to the industry," and relaying its hope that "DNSC incinerate[ ] or bur[y] all its quebracho beyond the FY03 sales." (AR 892–93 [December 14, 2001 letter from the Chamber to DNSC].) In February 2002, Chamber member Unitan entered into a contract with DNSC to purchase the 20,000 LT of quebracho available in 2002 and 2003. (*See* Def.'s Facts ¶ 10.)

DNSC simultaneously began burying quebracho. By the end of fiscal year 2003, it had buried approximately 60,000 LT at a cost of approximately six million dollars. (Def.'s Facts ¶ 11.) However, "[s]ince landfilling costs had been larger than an-

---

**2.** Quebracho quantities are expressed in long tons (LT), each of which is equal to 2,240 pounds.

ticipated," DNSC did not bury the entire quantity of remaining quebracho, and still had approximately 17,000 LT in its inventory. (Deister Dec. ¶ 28.) DNSC decided to again put its quebracho into the market, because it "had begun receiving inquiries from companies interested in purchasing DNSC quebracho." (Id.) In setting the future AMP amounts, MIC authorized the sale of up to 6,000 LT for fiscal year 2004, and proposed the sale of 6,000 LT in 2005 as well. (See id. ¶ 29–30; see also AR 173–78 [December 16, 2003 letter from MIC co-chairs to DNSC].) [3]

In March 2004 DNSC received an offer from Lyons & Volpi Leather Company, owned and controlled by the Italian firm Volpi Guiseppe, and on March 19, DNSC awarded Lyons & Volpi a contract for approximately 3,000 LT of quebracho at a price of $112 per LT ($0.05 per pound). (See AR 823–30, 1354–56 [March 18, 2004 Sales Contract].) The contract includes an option for an additional 2,200 LT for 2005, contingent upon the AMP limit being approved for that year. On April 15, 2004, the government solicited bids for the remainder of their sales limit, and on May 4, it awarded a contract for approximately 2,600 LT to Westan Tanning Company at the same price. (See AR 1357–58 [May 3, 2004 Sales Contract].) The government has reached its recommended sales limit

for 2004 and has thus suspended further quebracho sales until fiscal year 2005.[4]

Plaintiffs claim that the government's sales of stockpiled quebracho in 2004, and the proposed sales for 2005, violate the Stock Pile Act since they would unduly disrupt the quebracho market. The 6,000 LT sold by DNSC this year is approximately fifteen percent of the world market share, and the price at which it was sold is well below the market price of $800 per LT. (See Compl. ¶ 14.) Plaintiffs are concerned that the sale of substantial quantities of stockpiled quebracho below the market price will leave them without sufficient purchasers and will drive down the market price to unprofitable levels, thereby causing their factories to close.[5] Their complaint requests a permanent injunction prohibiting DNSC from selling stockpiled quebracho unless and until adequate measures are taken to avoid undue market disruption as required by the Stock Pile Act. (Compl.¶¶ 44, 49.) As a means of permanently avoiding the economic disruption they anticipate from the government's quebracho sales, they also seek to require the government to proceed with its earlier plan to bury the remaining quebracho. (See id; see also Opp. at 12–17.)

On March 18, 2004, the day before DNSC awarded a contract to Lyons & Volpi, plaintiffs filed a motion for prelimi-

---

3. The MIC committee meeting notes reflecting this decision state: "The discussion then shifted to the actual amount of [quebracho] that might be sold by DNSC in FY04. Several MIC members suggested placing an artificial ceiling of up to 6,000 LT of [quebracho], as the DNSC believed that domestic demand was roughly in this range. As to the remaining inventory of [quebracho], the MIC suggested burial as the most effective way to bring this long-running issue to an end. The DNSC responded that they would consider that option as they wished both for closure and to cut storage expenses."

4. Since March 1, 2004, DNSC has also offered relatively small amounts of quebracho for sale through its Strategic Supply Alliance (SSA), an interactive web-based system that awards sales to pre-registered buyers. (See Mot. at 5.) Sales under this program are limited to 160,000 pounds per month, and only two SSA contracts may be awarded per month. (See id.) SSA sales are included in the AMP limit.

5. Indeed, the Complaint details that plaintiffs' decreased quebracho sales between 1990 and 2000 led to the closure of three factories and the collapse of the companies that operated them. (See Compl. ¶ 14.)

nary injunction. The Court issued an oral ruling on plaintiffs' motion at the hearing held on May 17, 2004, limiting delivery of quebracho under the DNSC contracts to 3,000 LT (as opposed to 6,000 LT) until a decision on the merits could be reached. As explained by the Court, this quantity was more in line with the government's prior quebracho sales history, especially given the uncertainty as to whether sales to Westan Tanning Company constituted domestic or international sales.[6] (Transcript of May 17, 2004 hearing ["Tr."] at 53–58.) By virtue of this ruling, the government was given the opportunity to file the administrative record and to brief its claim that it had a rational basis for concluding that the sale of 6,000 LT of quebracho per year at a price of about $110 per LT would not unduly disrupt the quebracho market. .[7] The government's motion for summary judgment is now before the Court, and as set forth below, because the administrative record is devoid of any evidence reflecting a consideration by defendants of the impact their sales would have on the quebracho market, the government's motion will be denied and judgment will be entered for plaintiffs.

## ANALYSIS

### I. Standard of Review

■ Since DNSC's action is governed by the "arbitrary and capricious" standard of the Administrative Procedures Act (APA), it cannot be set aside unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This inquiry requires a court to consider whether the agency's decision was within its authority under the Stock Piling Act, as well as whether that decision was "based on a consideration of the relevant factors" reflecting no "clear error of judgment." *Associated Metals & Minerals Corp. v. Carmen,* 704 F.2d 629, 633 (D.C.Cir.1983) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). The Court cannot substitute its judgment for that of the agency if a rational basis has been provided for its decision. *See id.; see also Sloan v. Dep't of Housing & Urban Dev.,* 231 F.3d 10, 15 (D.C.Cir.2000).

■ Deference to agency decision-making, however, does not require the Court to accept an agency's failure to consider relevant factors or accept its clear errors of judgment. *Sloan,* 231 F.3d at 15 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). The "agency must cogently explain why it has exercised its discretion in a given manner, and that explanation must be suffi-

---

**6.** As noted by plaintiffs in their Opposition at 5 n. 5, they "do not oppose sales in the U.S. domestic markets, provided it is consumed domestically." Since it was not known at the time of the preliminary injunction hearing (nor has it been clarified to date) whether sales to either company would qualify as domestic sales, the Court could not determine the exact percentage of international sales represented by the proposed 2004 and 2005 sales. However, even assuming that all sales represented international sales, the Court, by limiting sales to 3,000 LT, capped the percentage at approximately 7% of international sales, which is comparable to the highest pri-

or percentage of DNSC sales (in 1993), with the exception of the sales to the plaintiffs in 2002 and 2003.

**7.** Since the time of the hearing, DNSC has received shipping instructions from Lyons & Volpi for delivery of approximately 89 LT. The contract between the Stockpile Center and Lyons requires Lyons to remove and pay for the quebracho it bought within a year of the date of the contract award of March 18, 2004. Westan must pay for and remove its quebracho within nine months of the date of its contract executed on May 3, 2004.

cient to enable [the Court] to conclude that the agency's action was the product of reasoned decisionmaking." *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C.Cir.1995) (internal citations and quotation marks omitted). An agency's action may be deemed arbitrary and capricious if its rationale does not appear in the administrative record so that its decisionmaking "path may reasonably be discerned." *See Sierra Club v. EPA*, 167 F.3d 658, 665 (D.C.Cir.1999) (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)); *see also Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (an agency's action is arbitrary and capricious if it has not taken "whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale at the time of decision"). If an agency merely "parrots the language of a statute" without providing a rational—much less reasoned—explanation for its result, the agency has not met its burden. *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404–05 (D.C.Cir.1995).[8]

## II. DNSC's Decision

 In order to demonstrate that the government's decision to sell quebracho at the quantity and price it has chosen was not "arbitrary and capricious," the administrative record must provide evidence that the government considered the impact on the quebracho market and had a rational basis for concluding that its sales would not create undue disruption in the market.[9]

---

**8.** The government seeks deference under the standard articulated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), which requires a court to defer to an agency's interpretation of an ambiguous statute as long as it is "based on a permissible construction." *Id.* at 843–44, 104 S.Ct. 2778. Although defendants are to comply with the mandate set forth in 50 U.S.C. § 98e(b)(2) in making their sales decisions, those decisions do not rise to the level of a definitive, formal agency determination warranting *Chevron* deference. *See Pharmaceutical Research and Mfrs. of America v. Thompson*, 362 F.3d 817, 821–22 & n. 5 (D.C.Cir.2004) (citing *United States v. Mead Corp.*, 533 U.S. 218, 230–31, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)) (*Chevron* deference is not warranted when the agency's ruling does not carry the force of law).

The agency's determination, then, is to be granted "only so much deference as its persuasiveness warrants." *Power v. Barnhart*, 292 F.3d 781, 786 (D.C.Cir.2002); *see also Mead*, 533 U.S. at 235, 121 S.Ct. 2164 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). An agency's determination has little persuasive value, of course, if its decisionmaking "path" cannot "reasonably be discerned" *see Bowman*, 419 U.S. at 286, 95 S.Ct. 438, such that the court cannot evaluate the agency's rationale at the time of decision. *See Pension Benefit*, 496 U.S. at 654, 110 S.Ct. 2668.

**9.** Although plaintiffs persist in their wish that all market disruption must be avoided, that is not the law. Rather, *some* market disruption is to be expected any time the government enters a market to dispose of surplus stockpiled materials. *See Associated Metals*, 704 F.2d at 636 & n. 13. The Act does not require complete avoidance of any market disruption, but instead, only protects producers and consumers from "indiscriminate dumping" of surplus materials "in such quantities as might break the market." *Id.* at 635 (citations omitted). Under the APA, however, the Court's role is not to decide whether undue disruption has occurred, but is limited to an evaluation of whether the government has provided a rational basis for its conclusion that, to the maximum extent feasible, it has avoided undue disruption of the market. Moreover, as the government argues, the statute does not require it to develop a clearly defined test for determining "undue market disruption" (*see* Reply at 9 (quoting *Howes Leather Co. Inc. v. Golden*, 681 F.Supp. 6, 14 (D.D.C.1987)) ("[t]he term 'undue market disruption' is difficult to define, and the agency must make a 'judgment call'")), but only requires that it avoid market disruption "to the maximum extent feasible."

At the preliminary injunction stage, the government relied on boilerplate statements made by MIC in the letters in 2002 and 2003 that issued AMPs and annual sales quantities for stockpiled materials. These letters state:

> We thoroughly examined current market conditions, background information, data, and analysis pertaining to each material and the proposed disposal quantities. We also considered price trends, stock levels, changing trade patterns (including net imports), other relevant data, the public comments, and DNSC efforts to protect the U.S. Government from avoidable loss .... It is the consensus of the Committee that at this time, the proposed disposal quantities ... are not likely to cause undue disruption of the usual markets of producers, processors, or consumers of these materials.

(*See* AR 173–78 [December 16, 2003 letter from MIC co-chairs to DNSC]; *see also* AR 163–66 [December 11, 2002 letter from MIC co-chairs to DNSC].)

In these letters, MIC advises DNSC to "continue to explore opportunities for disposal of the [quebracho] other than by sale" and to "closely monitor market developments for [quebracho]." (*Id.*) MIC states that it continues to be "very concerned with the current depressed state of a number of commodity markets and urges [the Stockpile Center] to act as prudently as possible when consummating individual commodity disposal transactions in these markets so as not to cause any undue market impact by the transaction." (*Id.*)

As the Court observed at the preliminary injunction stage, these letters contain "conclusory" statements (Tr. at 37, 49), and as a result, the Court was unable to conclude, based on the record before it at the time, that defendants had performed the necessary analysis regarding market disruption when deciding to substantially increase its sales over prior years. Now defendants have provided the administrative record in an attempt to fill the gap that existed at the preliminary injunction stage. But a review of the administrative record fails to cure the problem, for while the evidence presented shows that the government examined the profitability of its sales as compared to the costs associated with storage or disposal (*i.e.*, whether it was "protect[ing] the United States against avoidable loss"), there is no evidence that the government considered the other side of the coin (*i.e.*, whether its actions, to the maximum extent feasible, would "avoid undue disruption of the usual markets of producers...."). As mandated by statute, these factors must be balanced by the agency, and while the "balancing of permissible factors is a matter of judgment best left to the agency...," *Howes Leather*, 681 F.Supp. at 14, the Court must be able to discern how the agency made this judgment call. Based on the administrative record, this cannot be done here.

In response, defendants point to the "pricing objectives memoranda" as evidence that they set a price for quebracho that would protect the market from undue disruption. (*See* Mot. at 13.) These memoranda list the "target," "high" and "low" prices at which DSNC intends to sell quebracho "based on the past history of the sales program." (*See* AR 912–58 [DSNC Pricing Objectives from May 19, 1999—March 17, 2004].) For example, the memorandum for fiscal year 2004 indicates a "target" pricing objective of $0.105 per pound, a "high" price of $0.20, and a "low" price of $0.01. (See AR 956–58 [March 17, 2004 DNSC Pricing Objectives Memorandum].) While these memoranda adequately describe the characteristics of the government's quebracho which in turn would cause its value to be lower than new que-

bracho thereby justifying a lower sales price,[10] they do not evidence any consideration of the effect that these prices and the proposed sales quantities would have on the market.

The government argues, nonetheless, that its sales will not cause market disruption because "DNSC officials ... generally would not accept any offer for the sale of tannin at a price lower than the low objective" (Deister Dec. ¶ 8), and attempts to justify the proposed sales for 2004 on the basis that they were made "consistent with the pricing objectives" set forth in these memoranda. (Mot. at 13.) The last two pricing objectives (dated February 6, 2002 and March 17, 2004) state, however, that "[t]he low price objective reflects the savings the Government would realize by having the material removed quickly. This savings is in the form of lease monies that DNSC would not expend to store the tannin. Therefore, DNSC management has made a decision to consider all offers" for the purchase of quebracho. (AR 954–58.)[11] The fact that the government's 2004 sales comply with the pricing objective authorizing DNSC to liquidate quebracho at prices as low as $0.01 per pound

simply does not equate with an analysis of the potentiality for undue market disruption from these sales.[12]

Other than these pricing memoranda, the government points to little else in the record to demonstrate how the agency balanced the relevant factors identified by the Act. It does attempt to explain its deficiencies by arguing that in making its 2004 sales decisions, it "utilized the best information and analysis available to it," but that there are "difficulties associated with conducting market research regarding the quebracho market." (Mot. at 16–18.) It blames its failure to conduct econometric studies on the fact that the quebracho market is not susceptible to such studies because, as observed in *Howes Leather*, quebracho is "not publicly traded, there is no published trade data for it, and there are no domestic and only a few foreign producers." 681 F.Supp. at 9. In *Howes Leather*, the Court upheld the government's selection of a cut-off price for a quebracho sale against a challenge brought by an unsuccessful bidder, despite the government's failure to conduct econometric studies as to the market ramifications of

---

10. The government's quebracho is less valuable than the material offered by the Chamber, because its solid form increases consumers' processing costs. (*See* Def.'s Facts ¶ 6.) Before DNSC's quebracho can be used, purchasers must heat or grind the solid material into a form more suitable for processing, and may have to remove excess iron and copper from the product. DNSC does not warrant or guarantee the material, and does not pay for transportation or insurance, adding additional costs for the purchaser. (*See id.*) *See also Howes Leather*, 681 F.Supp. at 10–11 (discussing how price of stockpiled quebracho is 15–25% lower than producers' prices because of differences in quality, age, packing, lack of warranty, and lower tannin levels).

11. Prior pricing objective memoranda reflect a similar approach. From May 19, 1999 until February 15, 2000, the pricing objective was

accompanied by a statement indicating that "[p]er direction of DNSC management, in order to avoid the expense of moving and/or disposing of the Quebracho, DNSC will accept offers as low as $0.03 per pound at the Flagstaff, AZ, location." (AR 912–31.) On March 15, 2000, the notice was amended to $0.02 per pound, until October 11, 2001, when the notice was changed again to indicate that "[p]er direction of DNSC management, in order to avoid the expense of disposing of the Quebracho, DNSC will take into consideration any offer." (AR 932–53.)

12. Notably, as documented in the pricing objective memoranda, the "low" price of $0.01 per pound for stockpiled quebracho is 97.4% lower than the market price of new quebracho ($0.3872). (*See* AR 954–55 [February 6, 2002 DNSC Pricing Objectives Memorandum].)

its sales or the cut-off price selected. *Id.* It found that although the government's market analysis could have been more "sophisticated or elaborate, it nonetheless was soundly based on factors directly relevant to the concerns about market impact." *Id.* There, the government, having relied upon two quebracho market analyses performed by the General Services Administration and having conducted informal market analyses, attempted to determine the real market value of the stockpiled quebracho in a way that would "minimize impact on the ... market by avoiding price leadership." *Id.* at 9 n. 12 & 12 n. 19. The Court found that these efforts, along with the government's reliance upon the competitive bids from seven purchasers, provided the best indication of the market value and were sufficient to demonstrate that its price setting had a rational basis with regard to the Stock Pile Act's mandates. *See id.* at 13–14.

Defendants compare their conduct to the government's efforts in *Howes Leather* to argue that they likewise have complied with the Act. But importantly, the issue before this Court is different than that presented in *Howes Leather.* There, the plaintiff brought a challenge to the cut-off price the government had set for accepting bids, and therefore, the Court appropriately focused primarily on the government's consideration of the available pricing information in making the challenged decision. Here, plaintiffs challenge the alleged market disruption caused by the government's sales. Evidence that the government considered pricing information to determine the profitability of its sales and a fair price for consumers does not, however, suffice to demonstrate that it also considered the potential effects of the sales on producers, and thus, *Howes Leather* is not directly on point.[13]

Moreover, to the extent that *Howes Leather* provides a yardstick for judging compliance with the Stock Pile Act, defendants' conduct here falls short. The administrative record contains no evidence of any type of market analysis, whether informal or formal, as to whether the rate or quantity of sales that DNSC proposed for 2004 and 2005 was consistent with the statutory mandate to avoid undue market disruption. Instead, the only pre-sale or contemporaneous analysis in the record—the December 2000 Business Case Analysis (BCA) done by Booz Allen Hamilton to provide DNSC with "sufficient information to make an objective and rational decision on the disposition of tannin" (AR 273–335)—focuses solely on the issue of the profitability of the sales to the United States and is silent on the issue of market impacts. In fact, it even considers an alternative called "accelerated sales (Fire Sale)" of all of the government's remaining quebracho at $0.01 per pound over a three-year period. (*See* AR 301.)[14] The government also emphasizes that, as in *Howes Leather,* it visited potential buyers to "conduct market research." (*See* Mot. at 18.)

---

13. Moreover, it is not clear what determinations the government made based on its purported "analysis of pricing information," as each of the pricing objective memorandum states that "[t]he only viable way to establish the value of the [stockpiled] quebracho is to base the current market price on DNSC's sales history of the commodity." (*See, e.g.,* AR 956–58.)

14. The government concedes that the BCA was not intended to "address the issue of undue market disruption," but then inexplicably argues that "when it later became time to make a decision about whether to implement one of these courses of action, DNSC acted in accordance with its statutory mandate to avoid undue market disruption." (Reply at 6–7.) The problem, however, is that the government has offered absolutely no evidence to support this assertion.

However, compared to the detailed information obtained and documented in the record relating to the determination of a fair market value there (*see Howes Leather*, 681 F.Supp. at 9 n. 12), the government in this case states only that the purpose of the visits to its previous customers was to "gauge interest in the purchase of tannin in general, and to determine if a Strategic Supply Alliance would generate interest in quebracho sales." (Deister Dec. ¶ 31.) Finally, unlike *Howes Leather*, the government cannot justify its price as reasonable by relying upon the competitive bid process, for the two 2004 sales were the only bids, and they were awarded at the price offered by the purchasers. (*See id.* ¶¶ 34–35.)

The government further contends that the information it received from the Chamber while it was making its sales decisions was "not sufficiently compelling" as to cause DNSC to alter its intended course of action. (*See* Mot. at 19.) It explains that "[t]he Chamber has provided assertions predicting certain negative effects on the quebracho industry, or conclusions regarding undue market disruption, but has not provided substantial information or data to support these assertions ... [and][w]hen the Chamber has provided information to support its claims, the information has not been particularly helpful [or] ... persuasive." (Mot. at 19–20.) The Chamber, however, does not have the burden to establish that the government's actions impact the quebracho market; rather, DNSC

is charged with making some sort of determination that its actions will not unduly disrupt the market.

Moreover, there is little in the record to demonstrate that the government contemporaneously evaluated the information provided by the Chamber, or more importantly, conducted any analysis based on the information it received. In November 2002 plaintiffs submitted to MIC's co-chairs an economic analysis by L. Daniel Maxim purporting to describe the effect DNSC quebracho sales would have on the world market. (*See* AR 1389–90 [Letter from Alejandro Casiro to Terri Robl and Richard Meyers with Maxim Report attached].) While the government contends that "DNSC staff carefully reviewed the [a]nalysis" in the Maxim report, rejecting some of its assumptions and conclusions (Deister Dec. ¶ 27), there are no documents in the record evidencing such a review.[15] Instead, the government provided a review of the Maxim report, dated June 24, 2004, written by Senior Market Analyst—Team Leader for the Directorate of Planning and Market Research for the DNSC, Thomas Rasmussen, responsible for the market research and economic analysis of the commodities DNSC sells.[16] This critique—whether or not it would be sufficient to demonstrate a rational basis for concluding a lack of undue market disruption—clearly cannot be used now to meet the government's burden as it was conducted well after the government made

15. While it appears that a DNSC economist, David Warlick, reviewed the Maxim report, as Dr. Maxim sent a response to his comments on Dr. Maxim's analysis, (*see* AR 1422–25 [March 5, 2003 letter from L. Daniel Maxim to David Warlick]), there is nothing in the record reflecting Warlick's analysis of market disruption, only his dissatisfaction with plaintiffs' data.

16. It is telling that in his affidavit, Mr. Rasmussen states that he was asked to review the Maxim Report in May 2004, and although he was "generally aware that DNSC had been in discussions" with the Chamber for some time prior to his review of the Report, he "had not been specifically aware of the details of DNSC quebracho sales, or of the Chamber's allegations that DNSC sales of quebracho caused undue market disruption." (Rasmussen Dec. ¶ 3.)

the relevant sales decisions. *See Gerber v. Norton,* 294 F.3d 173, 184 (D.C.Cir.2002) (quoting *Grand Canyon Air Tour Coalition v. FAA,* 154 F.3d 455, 469 (D.C.Cir. 1998)) ("We do not generally give credence to such post hoc rationalizations, but rather 'consider only the ... rationale actually offered by the agency ....' "); *Nat'l Mining Ass'n v. Mine Safety & Health Admin.,* 116 F.3d 520, 534 (D.C.Cir.1997) ("In evaluating agency action, we look at the reasons given by the agency, not counsel's post hoc rationalizations.") (citations omitted).

It is clear that the government has been aware of plaintiffs' concerns relating to the quebracho market and the sale of stockpiled quebracho. The administrative record contains numerous letters from plaintiffs and the Argentine Embassy on behalf of plaintiffs, and the minutes of MIC meetings reflect some consideration of plaintiffs' concerns. Each time the issue came up in MIC meetings, however, DNSC focused on the potential marketability and profitability of its quebracho, with no reference to whether its sales would unduly impact the market.[17] Without evidence in the record of any such analysis or consideration of the need to avoid undue market effects, the Court cannot "discern the path" the agency took in making its decision, and thus, it cannot find that the government's decision was not arbitrary and capricious. *See Sierra Club v. EPA,* 167 F.3d 658, 665 (D.C.Cir.1999).

### III. Appropriate remedy

■ Under the APA, "reviewing courts generally limit themselves to remanding for further consideration an agency order wanting an explanation adequate to sustain it." *Fox Television Stations, Inc. v. F.C.C.,* 280 F.3d 1027, 1047 (D.C.Cir.2002); *see also Tourus Records, Inc. v. Drug Enforcement Admin.,* 259 F.3d 731, 737 (D.C.Cir.2001). Plaintiffs, however, contend that they are entitled to a judgment directing the government to landfill the remaining stockpiled quebracho. They argue that the Court's "broad" equitable powers are appropriately applied to enforce the government's 2001 decision to bury 80,000 LT of the 100,000 LT it had at that time, claiming that they purchased the remaining 20,000 LT in reliance upon the government's plan. (*See* Opp. at 12–14.) This injunction, they claim, would be consistent with MIC's recommendation and the BCA's conclusion that burial of the entire inventory is the best economic option. Finally, plaintiffs claim that forced burial of the stockpiled quebracho is warranted because of the devastating effect that annual sales of 6,000 LT of the government's quebracho would have on their business.

Plaintiffs' request for such an extraordinary remedy must be denied. It is wholly inconsistent with the statutory mandate of the Stock Pile Act to compel the government to bury its remaining inventory of quebracho. The statute requires the government to make sales decisions that protect United States taxpayers against avoidable loss and does not demand that the government protect other quebracho market participants from all competition, especially when they enjoy a virtual monopoly. Indeed, under the Stock Pile Act, the gov-

---

17. For instance, the minutes from November 16, 1999 indicate that "[t]he committee discussed at length Argentine government complaints regarding stockpile sales of quebracho tannin." While the State Department proposed lowering AMP levels from 16,000 to 5,000 long tons per year, DNSC defended the proposed AMP levels by stressing the profitability to the DNSC based on its arguments that "(a) their use of negotiated prices negates a claim of 'unfair' pricing, and (b) that the proven marketability of tannin negates a recommendation for destroying the remaining stock." (AR 130.)

ernment is *required* to reevaluate its disposal plans if the costs incurred by the government for landfilling its quebracho are higher than anticipated (*see* Deister Dec. ¶ 23) or if the government becomes aware of a higher demand for its quebracho (*see id.* ¶ 31–32) so as to minimize the economic loss associated with the quebracho's disposal. Plaintiffs' request is even inconsistent with their own position, for they state that they "do not oppose sales of Stockpile quebracho in U.S. domestic markets, provided it is consumed domestically." (Opp. at 5 n. 5.) Moreover, as a factual matter, it is far from clear that the government "promised" to bury the remaining quebracho.[18] In any event, it is not the job of this Court to substitute its judgment for that of the agency's as to the appropriate means for disposing of stockpiled quebracho. *See Sloan,* 231 F.3d at 15; *Associated Metals,* 704 F.2d at 633.

Therefore, the Court will not require DNSC to bury the remaining quebracho. Nor will the Court enjoin the government from current or future sales in the United States domestic market—provided the quebracho sold is consumed domestically—for plaintiffs do not oppose such sales. (*See* Opp. at 5 n. 5.) The Court will, however, deny defendant's summary judgment motion, remand the issue to the agency for further consideration, and issue judgment for plaintiffs insofar as DNSC is enjoined from delivering quebracho to, or awarding new contracts to, any entity purchasing quebracho for consumption outside of the United States until it has evaluated all the permissible factors, including the market impacts of its sales.

A separate Order accompanies this Memorandum Opinion.

### *ORDER*

For the reasons provided in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment is **DENIED**; it is

**FURTHER ORDERED** that the Court's Order issued on May 17, 2004 is **VACATED**; and it is

**FURTHER ORDERED** that judgment is entered on behalf of plaintiffs insofar as defendants are enjoined from conducting sales of stockpiled quebracho, unless such sales are in United States domestic markets to be consumed domestically, pending agency action consistent with the accompanying Memorandum Opinion.

**SO ORDERED.**

---

18. For example, DNSC indicated in a letter to the Chamber in October 2001 that it advised Embassy representatives in August 2001 that the government could not commit to burying its entire inventory of quebracho "due to limited funding." He continued by stating: "In fact, concurrent with disposal of the material, it is our intention to continue to sell tannin whenever feasible to generate additional funds to dedicate to the burial program." (AR 1383–84 [October 22, 2001 letter from Cornel Holder to Ariel Mato].)